IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> THURMAN P. BRYANT, III, and : <br> BRYANT UNITED CAPITAL FUNDING, INC. : <br> : <br> Defendants, : <br> : <br> ARTHUR F. WAMMEL, : <br> WAMMEL GROUP, LLC, : <br> THURMAN P. BRYANT, JR., : <br> CARLOS GOODSPEED a/k/a SEAN PHILLIPS : <br> d/b/a TOP AGENT ENTERTAINMENT d/b/a : <br> MR. TOP AGENT ENTERTAINMENT : <br> : <br> Relief Defendants. : <br> : | Civil Action No.: <br> <br> FILED UNDER SEAL |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants Thurman P. Bryant, III ("Bryant") and his company Bryant United Capital Funding, Inc. ("BUCF") (collectively "Defendants") and Relief Defendants Arthur F. Wammel ("Wammel"), his company Wammel Group, LLC ("Wammel Group"), Carlos Goodspeed a/k/a Sean Phillips d/b/a Top Agent Entertainment d/b/a Mr. Top Agent Entertainment ("Goodspeed"), and Thurman P. Bryant, Jr. ("Bryant, Jr.") (Wammel, Wammel Group, Goodspeed, and Bryant, Jr. collectively, "Relief Defendants"), and alleges the following:

SEC v. Bryant, et al.
Complaint – Page 1

# I.
# SUMMARY

1. The Commission files this emergency action to halt an ongoing investment scheme and securities fraud being perpetrated on approximately 100 unsuspecting investors by Bryant and BUCF. These investors are being actively defrauded.

2. Since at least March 2011, BUCF and Bryant, BUCF's CEO and President, have raised approximately $22.7 million from approximately 100 investors in Texas and other states, through materially false and misleading statements and omissions. In fact, BUCF and Bryant have raised approximately $1.4 million since January 2017 alone. Among other things, BUCF and Bryant promised investors guaranteed minimum annual returns of 30% on risk-free investments Bryant represented he would make in the mortgage industry.

3. Specifically, Bryant and BUCF promised investors their funds would be safely preserved in a secure escrow account and used for the sole purpose of serving as proof of funds to enable BUCF to secure a line of credit with which to pursue a mortgage-related investment program. As Bryant and BUCF knew, these promises were false. No secure escrow accounts existed, and there was no mortgage-related investment program. In reality, and directly contrary to representations they made, Defendants commingled investor funds in a single deposit account controlled by Bryant, from which he, among other things, (a) funneled approximately $16.1 million to Wammel and Wammel Group; (b) misappropriated $4.8 million to fund his personal living expenses; (c) transferred $1.37 million to Goodspeed; and (d) paid out at least $140,000 to Bryant, Jr., all without investors' consent or knowledge.

4. To date, BUCF has paid approximately $16.8 million to its investors in the form of purported investment returns and, for certain investors, significant referral fees for identifying new investors. BUCF has never used investor monies as Bryant claimed it would, and monies

paid out as referral fees and supposed profits on investments are, rather, misappropriated monies sourced from other investors, including Ponzi payments.

5. For their part, Wammel and Wammel Group received BUCF investor funds and commingled them with money raised from Wammel Group's own, non-BUCF investors in order to (a) make distributions to BUCF; (b) make distributions to Wammel Group's investors; and (c) fund high-risk investment schemes, including speculative options trading by Wammel since at least 2011. BUCF's investors were never told of, and hence never approved of, Wammel Group's involvement or its use of their funds. Wammel Group does not have, and never has had, any legitimate claim to the funds it received from BUCF.

6. Notwithstanding the facts that (a) Defendants never disclosed to investors that their funds would be transferred to Wammel and Wammel Group; and (b) Wammel and Wammel Group should never have received the funds in the first place, Wammel Group's options trading receipts from 2011 through 2016 totaled only about $5.9 million—well short of the sum required to pay BUCF investors the 30% returns they were promised. To date, Wammel Group has paid $15.8 million to BUCF, comprised of funds received from BUCF, funds raised from Wammel Group's non-BUCF investors, its limited trading profits, and other sources—all of which Wammel Group commingled. As recently as April 2017, Wammel removed approximately $385,000 from options trading accounts under his control and in which BUCF investor funds were received.

7. Since January 2017 alone, Bryant and BUCF have solicited and accepted additional investments from unknowing investors totaling approximately $1.4 million. However, since becoming aware of the Commission's investigation in December 2016, Defendants have

pivoted their behavior and handling of investor funds, and no longer appear to be funneling money to Wammel Group.

8. Unbeknownst to BUCF investors, Bryant and BUCF have transferred $1.37 million of investor funds to Goodspeed since January 2017. Goodspeed, doing business as Top Agent Entertainment, purports to be a concert promotor and booking agent for entertainers like Taylor Swift and Aubrey "Drake" Graham. Bryant intentionally or at least recklessly put BUCF investor funds at risk by transferring them to Goodspeed, not only because doing so violated his express promises to investors about how their money would be used, but also because even a rudimentary review of Goodspeed's background online and in public records would have revealed relevant concerns about his track record and reputation. Goodspeed provided no services or consideration in exchange for these funds, and has no legitimate claim to monies which were misappropriated from unwitting investors who were promised a no-risk investment in the mortgage industry in which their principal would be protected against loss in secured escrow accounts.

9. As recently as April 2017, BUCF transferred $140,000 to Bryant's father, Bryant, Jr. While Bryant, Jr. is a BUCF investor, his monthly distributions since December of 2014 have never exceeded $16,750. The sums paid to Bryant, Jr. are not returns on investments in the mortgage industry, and Bryant Jr. has no legitimate claims to these funds.

## II.
## DEFENDANTS

A. **DEFENDANTS**

10. Bryant, age 44, is a resident of Frisco, Texas and is the CEO and President of BUCF.

11.     BUCF was formed as a Texas corporation in June 2011 and has its principal place of business in Katy, Texas.

**B.    RELIEF DEFENDANTS**

12.     Wammel, age 44, is a resident of Kemah, Texas and is the CEO of Wammel Group. Together with Wammel Group, Wammel received approximately $16.1 million in BUCF investor funds to which he has no legitimate or lawful claim.

13.     Wammel Group is a Texas limited liability company with its principal place of business in Kemah, Texas. Together with Wammel, Wammel Group received approximately $16.1 million in BUCF investor funds to which it has no legitimate or lawful claim.

14.     Goodspeed, age 36, is a resident of Addison, Texas. Goodspeed received $1.37 million in BUCF investor funds to which he has no legitimate or lawful claim.

15.     Bryant, Jr. ("Bryant Jr."), age 67, is a resident of Golden, Colorado and is Bryant's father. Bryant, Jr. received $140,000 in BUCF investor funds to which he has no legitimate or lawful claim.

## III.
## JURISDICTION AND VENUE

16.     The Commission brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], seeking to restrain and enjoin the Defendants temporarily, preliminarily, and permanently from engaging in such acts and practices as alleged herein.

17.     This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Sections 21(e) and 27 [15 U.S.C. §§ 78u(e) and 78aa]. Each of the investments offered and sold as described in this Complaint is an investment contract and, therefore, a "security" as that term is defined under Securities Act Section 2(a)(1) [15 U.S. C. §

77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S. C. § 78c(a)(10)].

18. Bryant and BUCF, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this complaint.

19. Venue is proper because transactions, acts, practices, and courses of business described in this complaint occurred within this federal district.

## IV.
## FACTUAL ALLEGATIONS

A. **DEFENDANTS FALSELY PROMISED A GUARANTEED, NO-RISK INVESTMENT IN BUCF**

20. Bryant formed BUCF in or around June 2011 and is, and always has been, BUCF's sole officer, manager, decision-maker, and employee. Bryant opened, maintained, and has sole signatory authority over BUCF's single bank account. Hence, Bryant and BUCF's interests and activities were, and are, one and the same and their interests are, and always have been aligned.

21. In early 2011, Bryant began raising money from investors, beginning first with his father, Bryant, Jr. BUCF's earliest investors were supposed family and friends, though the investor count grew over time through word-of-mouth marketing. Today BUCF has approximately 100 investors located in Texas and other states, including at least two international investors. Defendants did not promote the BUCF investment opportunity through written offering documents. Rather, Bryant or existing BUCF investors would orally share the investment opportunity to potential investors. Existing BUCF investors encouraged potential investors to contact Bryant directly to learn about BUCF's purported investment.

22. Bryant encouraged existing investors to market the BUCF investment by paying them sizeable referral bonuses. The purported referral bonuses varied in amount from investor to

investor and were paid on a recurring basis, in that BUCF continued to pay referral bonuses to investors month after month, even for a single referral.

23. Once a potential investor contacted Bryant, Bryant pitched the investor on the opportunity, orally representing, among other things, that investor funds would be protected in segregated escrow accounts and used solely to serve as "proof of funds" for BUCF to secure a line of credit from a hedge fund. Bryant further represented that BUCF would use the line of credit to fund short-term mortgage loans, which long-term lenders would quickly purchase in exchange for a set fee paid to BUCF. Furthermore, Bryant promised investors, orally and in partnership agreements, that their investment bore no risk and was guaranteed to generate 2.5% monthly returns for a total of 30% annually.

### B. BUCF's Partnership Agreements and Account Statements

24. Even though BUCF is a corporation, Bryant and BUCF sold investors—and continue to sell—limited partnership interests in BUCF, documented by the *Limited Partnership Agreement of Bryant United Capital Funding* (the "BUCF Partnership Agreement"), which designates BUCF as the managing partner.

25. The BUCF Partnership Agreement specifies that BUCF, subject to very limited exceptions, "shall have full, exclusive and complete authority and discretion in the management and control of the Partnership business [...] and shall make all decisions affecting the business of the Partnership."

26. The BUCF Partnership Agreement defines the purpose of the partnership as "the return on the equity promised herein[.]" Section 6.2.1 of the BUCF Partnership Agreement specifically states that:

>Initial Preserved Capital [$_____]¹ with the guaranteed annual Distributions of [$_____] (USD) or monthly distribution rate of [$\_\_\_\_\_] (USD) starting on [\_\_\_\_\_], and will remain such return throughout the life of the investment. Any or all reinvested capital will grow at a 30% per rate and maintain the 30% Growth per year until "Limited Partner(s)" elects to remove Capital investment amount in full. All initial investment and any and all reinvested growth are retained in a secure escrow account for the benefit of the Limited Partner. No risk to capital account is expressed or implied by General/Managing Partner.²

27. After executing the BUCF Partnership Agreement, Bryant provided investors instructions for tendering their investment funds, and investors transferred their funds to BUCF by wire transfer or check. Investor distributions made pursuant to the BUCF Partnership Agreement typically began on the second month following the execution of the Partnership Agreement. This conduct reinforced Bryant's representation about BUCF's financial wherewithal and its ability to pay sizeable returns to investors.

28. Bryant and BUCF prepared and issued monthly account statements ("Account Statement(s)") to BUCF investors which falsely identified, among other things, an investor's supposed "Escrow Capital Balance," "Calculated Account Balance," and "Accumulated Account Balance."³

29. Investors based their understanding about the safety of their investment, the location and application of their funds, and the source of their monthly payments, on Bryant's oral promises and the information they received in the BUCF Partnership Agreement and the

---

¹ The bracketed numbers in this excerpt of the BUCF Partnership Agreement changed for each investor to reflect the actual capital contribution by the respective investors as well as the associated distributions and date of initial distribution.

² The BUCF Partnership Agreements evolved over the course of the scheme in some respects. For example, while most of the agreements guaranteed returns of 30% per year, some agreements promised 42% returns for the first year or even throughout the life of the investment.

³ In January 2017, BUCF and Bryant changed the "Escrow Capital Balance" to "Equity Balance."

monthly Account Statements.

### C. BUCF KNOWINGLY FAILS TO ESCROW INVESTOR FUNDS, AND INSTEAD DIRECTS FUNDS TO WAMMEL GROUP WITHOUT INVESTORS' KNOWLEDGE OR APPROVAL

30. Unbeknownst to investors, Bryant knowingly disregarded the promises and representations he and BUCF made to investors about the security and use of investment funds, and instead directed the majority of investor capital to an undisclosed third-party, Wammel Group. This was not an authorized or disclosed use of investor funds.

31. Wammel formed Wammel Group in or around September 2006 and is its sole officer, manager, decision-maker, and employee. Wammel opened, maintained, and has sole signatory authority over Wammel Group's financial accounts. Hence, Wammel and Wammel Group's interests and activities were, and are, one and the same and their interests are, and always have been aligned.

32. Wammel Group invests in various businesses, but the vast majority of Wammel Group's capital is used to trade securities, primarily options on index funds.

33. Wammel Group has at least 17 individual and entity investors (including BUCF) with combined capital contributions of approximately $44.7 million (including the $16.1 million Bryant transferred to it from unwitting BUCF investors).

34. From July 12, 2011 to April 30, 2017, BUCF transferred approximately $16.1 million of its investors' funds to Wammel Group, without investors' consent or knowledge. Wammel Group made monthly distributions to Bryant of approximately 3% of the BUCF assets held by Wammel. Since July 2011, Wammel has distributed a total of approximately $15.8 million to BUCF.

35. Wammel Group's investment revenues are far less than the sums it has distributed to BUCF. Wammel Group's total options trading receipts from 2011 through 2016 amounted to

only about $5.9 million and, since 2010, it has received less than $300,000 from its other investments in, among other things, cars and real estate. Hence while Wammel Group distributed $15.8 million to BUCF as purported investment returns, those sums were in fact comprised of limited earnings from options trading and other investments, ill-gotten BUCF investor funds received from BUCF, and funds obtained from Wammel Group's other, non-BUCF investors.

36. Based on the bank records, Wammel and Wammel Group have no other source of cash to support the level of distributions made.

37. Wammel Group ceased tendering monthly distributions to BUCF on or about April 1, 2017, soon after the Commission subpoenaed Wammel and Wammel Group for documents related to the relationship with Bryant and BUCF. In April 2017, Wammel withdrew at least $385,000 from Wammel Group options trading accounts he controls and which contain, or contained, ill-gotten gains obtained from investors.

### D. DEFENDANTS MADE MATERIAL MISREPRESENTATIONS AND OMISSIONS

38. In the BUCF Partnership Agreements, Account Statements, and in oral representations to investors and prospective investors, Bryant and BUCF made materially misleading statements and omitted material facts necessary to make the statements they made, in the light of the circumstances under which they were made, not misleading with regard to, among other things, (1) the nature of BUCF's business operations; (2) the risk associated with investing with BUCF; (3) the use of investor proceeds; and (4) the source of investor returns.

#### 1. *BUCF's Business Operations*

39. Bryant and BUCF orally made materially misleading statements regarding the nature of BUCF's business operations. Bryant and BUCF represented to investors that their funds would be used to facilitate the funding of mortgage loans. More specifically, Bryant and BUCF explained that BUCF would fund mortgages, and that those mortgages would be

immediately sold to third party banks and servicers in exchange for a fixed fee. Investor funds, according to Bryant and BUCF, would always sit safely in secure escrow accounts and be used for the *sole* purpose of securing a line of credit from an unnamed hedge fund with which BUCF would fund the mortgages. On this basis, Bryant claimed BUCF would make 30% distributions to investors without exposing the investors' capital to *any* risk. Based on these representations, investors reasonably believed that their investments with BUCF were used solely in connection with BUCF's work in the short-term mortgage lending industry. Investors relied on Bryant and BUCF's representations to decide whether to invest with BUCF.

40. Defendants' representations were fabrications. Defendants never placed investor funds in secure escrow accounts. They did not conduct any of the investment-related operations Bryant claimed they would. Instead, BUCF secretly directed approximately 71% of the monies invested— $16.1 million—to Wammel Group between 2011 and 2017 for speculative securities and options trading, without BUCF investors' knowledge or consent.

41. Unbeknownst to investors, Bryant and BUCF spent the remaining 29% of their money—$6.6million— for other undisclosed and unlawful purposes, including funding Bryant's extravagant lifestyle and making Ponzi payments to investors as purported investment returns. Thus, Bryant and BUCF's representations to investors as to BUCF's business operations were materially misleading.

### 2. *Investment Risk*

42. Bryant and BUCF made numerous materially misleading statements regarding the risk(s) associated with investing in BUCF. More specifically, in the vast majority of the BUCF Partnership Agreements, Bryant and BUCF represented that investor capital would not be put at any risk but would, instead, be held in a secure escrow account. In addition, Bryant and BUCF fabricated and disseminated to investors monthly statements that purported to identify an

investor's "Escrow Capital Balance," "Calculated Account Balance," and "Accumulated Account Balance," all of which falsely conveyed that the investor's capital was, in fact, sitting in a secure escrow account. In addition, Bryant orally and in the BUCF Partnership Agreements promised that investors' funds would not be put at risk. Based on these representations, investors believed that their investments with BUCF were safe and bore no or relatively low risk.

43. Bryant and BUCF knew that their representations concerning the risks of investing, or lack thereof, were false. Their investors' capital was never stored in a secured escrow account. In fact, no such escrow account(s) ever existed. Instead, Bryant and BUCF deposited investor capital into a single BUCF checking account, where they comingled investor funds with whatever other money BUCF held in its accounts. Bryant then either transferred those commingled fund to Wammel Group for its securities and options trading (and later to Goodspeed and Bryant Jr.) or used it to fund his lifestyle and make Ponzi payments to investors, which created the misimpression that the payments were returns on no-risk mortgage investments. Thus, Bryant and BUCF's representations to investors as to the risks associated with the investments were materially misleading.

44. Until recently, BUCF investors had no reason not to believe, based on their monthly account statements and verbal claims made by Bryant, that their initial investment monies were still safe in an escrow account.

### 3. *Misuse of Proceeds*

45. Bryant and BUCF made numerous materially false and misleading statements regarding the use of investment proceeds. In the BUCF Partnership Agreements, Bryant represented that the investors' funds would be secured in escrow accounts, and he orally represented that these funds would be used as proof of funds for a line of credit. All of this was untrue. First, investor funds were never escrowed but, as described above, commingled in one

checking account. Further, Defendants intentionally: (a) misappropriated $4.8 million to pay for Bryant's personal expenses and extravagances; (b) funneled approximately $16.1 million to Wammel Group for speculative options and securities trading; (c) sent $1.37 million to Goodspeed for no apparent legitimate or lawful reason; (d) sent $140,000 to Bryant Jr. as purported but unearned investment returns; and (e) made Ponzi payments to investors. These uses violated the promises and representations in the BUCF Partnership Agreement and monthly account statements, and those made by Bryant orally.

46. As discussed, Bryant spent $4.8 million of the investors' funds on himself and his family. In fact, Bryant paid his family's living expenses almost exclusively out of the same BUCF bank account into which investors deposited their funds and in which they believed they would be safely held and never placed at risk. Bryant's approximate monthly personal expenses paid with investor funds include, but are not limited to:

- $9,750 (and then $18,000 per month beginning in April of 2016) to rent a house in Frisco, Texas;
- $3,500 in lease payments for luxury and other vehicles;
- $1,800 for a housekeeper;
- $3,000 for meals and groceries;
- $3,400 for private school tuition;
- $1,000 for horse riding expenses; and
- $1,200 for an apartment.

Bryant also spent more than $250,000 to furnish and decorate his *rented* home.

### 4. *Source of Investor Returns*

47. Bryant orally represented to investors that BUCF's guaranteed 30% per year distributions would be generated from investments in the mortgage industry, and paid out monthly to investors. This was false. BUCF never used investor capital to facilitate the funding of short-term mortgage loans. Instead, the vast majority of investor capital—nearly $16.1 million or approximately 71% of all funds raised—was sent to Wammel Group. Prior to their

investments, BUCF investors were not told about Wammel, Wammel Group, or their involvement in their investments. Neither Wammel nor Wammel Group have been involved in the mortgage industry during the relevant period nor did they offer or sell investments therein.

48. Wammel Group used the majority of the $16.1 million of BUCF investor capital it received, commingled with $28.6 million in funds raised from Wammel Group's own investors, to fund speculative options and securities trading.

49. Notwithstanding this misuse of BUCF investor funds and the fact that Wammel Group should never have received those funds, Wammel Group's performance in the options market varied wildly, and over six years it received only $5.9 million from trading. Apart from options and securities trading, Wammel Group made approximately $300,000 from other investments using BUCF investor monies, including two car dealerships, a boat and RV storage facility, and two luxury rental cars—all without BUCF investors' consent, much less their knowledge. Like Wammel Group's options trading, these other investments deviate from BUCF's purported short-term mortgage lending business.

50. Wammel Group's revenues from trading and other activities were not sufficient to generate BUCF's promised 30% investor returns. While Wammel Group paid $15.8 million to BUCF between 2011 and 2017 as purported returns on investments, in reality those funds were comprised of (1) the $5.9 million in receipts from Wammel Group's options and securities trading; and (2) ill-gotten investor funds obtained from BUCF; and (3) funds raised from Wammel Group's own, non-BUCF investors.

51. Bryant and BUCF were well aware that BUCF's purported revenues did not come from BUCF's own investments in the mortgage industry, as represented to its investors, since Bryant alone controlled BUCF's single bank account as well as the receipt, management, use,

and repayment of investor funds.

E. **BRYANT AND BUCF CHANGED COURSE WHEN THEY LEARNED OF THE COMMISSION'S UNDERLYING INVESTIGATION, BUT THEY CONTINUE TO DEFRAUD NEW AND EXISTING INVESTORS**

   1. *BUCF Directs Investor Funds to Goodspeed Without Investor Consent or Knowledge, Putting the Money at Risk of Loss*

52. Bryant learned of the Commission's investigation in December 2016 when the Commission served Bryant and BUCF with a subpoena. Just since January 2017, Bryant and BUCF have transferred significant sums of investor funds to Goodspeed, who purports to be a concert promoter and booking agent for well-known entertainers.

53. Between January and March 2017, Bryant and BUCF transferred $1.37 million of new funds from new and existing investors to Goodspeed. Notations on wire transfer documentation for these transactions indicate that the funds are to be used to promote concerts by Taylor Swift and Aubrey "Drake" Graham. BUCF investors were never made aware of, and hence never approved, this purported investment with Goodspeed who according to public records:

- in 2011 pled guilty to felony theft in excess of $100,000 in Dallas County, Texas in *State of Texas v. Carlos D. Goodspeed*, Cause No. F1001270M (194th Judicial District Court, Dallas County, Texas), and received deferred adjudication.

- in 2011 was found liable by default judgment for fraud and breach of contract in connection with a supposed promise to secure concerts by Aubrey "Drake" Graham and "Ciara" Wilson in *Howard Smith, Steven Murphy, d/b/a 80's Baby Entertainment v. Carlos Goodspeed a/k/a Golden Child, Jason Rudd a/k/a Jason Rudd a/k/a DJ J Rudd*, Cause No. DC-10-11923 (filed Sept. 20, 2013, 134th Judicial District Court, Dallas County, Texas);

- in 2014 was found liable by default judgment for breach of contract in connection with an agreement to secure an event with Shawn "Jay-Z" Carter In *Michael Aigbedion v. Carlos Goodspeed a/k/a Sean Phillips d/b/a Top Agent Entertainment*, Cause No. CC-14-05445-C (filed Oct. 29, 2014, County Court at Law No. 3, Dallas County, Texas); and

- is a named defendant in ongoing litigation alleging Goodspeed committed fraud and other violations in connection with promising to promote events with Tremaine "Trey Songz" Neverson, among others, in

    - *Rachel Morgan and Art B4 Commerce, LLC v. Sean Phillips[4] and Sean Phillips d/b/a Top Agent Entertainment*, Cause No. CC-16-03340 (filed July 6, 2016, County Court at Law No. 3, Dallas County, Texas); and

    - *Evelina Smith v. Carl Phillip, a/k/a Carlos DeSean Goodspeed, a/k/a Sean Phillips, a/k/a Top Agent Entertainment*, Cause No. DC-17-03198 (filed March 15, 2017, 101st Judicial District Court of Dallas County, Texas).

2.  ***BUCF Directs Investor Funds to Bryant Jr***

54. In April 2017, Bryant and BUCF diverted $140,000 to Bryant's father, Bryant Jr., who is an early BUCF investor. Bryant, Jr. has no legitimate claim to these funds, and there is no legitimate purpose for the transfers, much less any indication that they were in furtherance of BUCF's stated short-term mortgage lending investment program.

55. At the time of the $140,000 payment, BUCF had already paid Bryant's father as more than he invested in BUCF, making Bryant, Jr. one of a handful of BUCF's investors who have received funds in excess of their initial investment. Further, BUCF's $140,000 payment to Bryant Jr. in April 2017, which was made by two cashier's checks for $20,000 and $120,000, was far more than Bryant Jr.'s highest monthly distribution of $16,750.

### V.
### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Fraud in the Offer or Sale of Securities in**
**Violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

56. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 55 of this Complaint by reference as if set forth verbatim in this Claim.

---

[4] "Sean Phillips" is a known alias of Goodspeed.

57. Defendants Bryant and BUCF directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails have: (a) employed devices, schemes, and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operate or would operate as a fraud and deceit upon the purchasers.

58. With respect to violations of Securities Act Section 17(a)(1), Defendants Bryant and BUCF engaged in the foregoing conduct and made the foregoing untrue and misleading statements knowingly or with severe recklessness.

59. With respect to violations of Securities Act Sections 17(a)(2), Defendants Bryant and BUCF knew or should have known that they obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60. With respect to violations of Securities Act Sections 17(a)(3), Defendants Bryant and BUCF knew or should have known that they engaged in transactions, practices, and courses of business which operated or would operate as a fraud and deceit upon the purchasers.

61. For these reasons, Defendants Bryant and BUCF have violated and, unless enjoined, will continue to violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Fraud in Connection With the Purchase and Sale of Securities
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

62. Plaintiff Commission re-alleges and incorporates paragraphs 1 through 55 of this Complaint by reference as if set forth verbatim in this Claim.

63. Defendants Bryant and BUCF, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails have: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operate or would operate as a fraud and deceit upon purchasers, prospective purchasers, and any other persons.

64. Defendants Bryant and BUCF engaged in the above-referenced conduct and made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

65. For these reasons, Defendants Bryant and BUCF violated and, unless enjoined, will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## VI.
## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

1. Temporarily restrain, and preliminarily and permanently enjoin, Defendants Bryant and BUCF from violating Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder;

2. Enter an order immediately freezing the assets of Bryant and BUCF, directing that all financial or depository institutions comply with such order;

3. Order Bryant and BUCF to each provide an interim accounting, under oath, for the period from January 1, 2010 through the date of the accounting.

4. Order that Bryant and BUCF be restrained and enjoined from destroying, removing,

mutilating, altering, concealing, or disposing of, in any manner, any of their books and records or documents relating to the matters set forth in the Complaint, or the books and records and such documents of any entities under their control, until further order of this Court;

5. Enter an order allowing the parties to engage in expedited discovery, including immediately serving discovery requests upon the parties and requiring the parties to respond to such discovery requests in an expedited fashion;

6. Order the appointment of a Receiver for Bryant and BUCF, for the benefit of investors, to marshal, conserve, protect, and hold funds and assets obtained by Bryant or BUCF and their agents, co-conspirators, and others involved in the scheme alleged in the Complaint, wherever such assets may be found.

7. Order Bryant, BUCF, Wammel, Wammel Group, Goodspeed, and Bryant, Jr. to disgorge an amount equal to the funds and benefits obtained unlawfully by each, or the amount which each party is otherwise found jointly and severally liable to disgorge, or to which each such party otherwise has no legitimate claim, as a result of the violations alleged, plus prejudgment interest on that amount;

8. Order Bryant and BUCF to each pay a civil money penalty in an amount determined by the Court under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] for the violations alleged herein; and

9. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

10. Order such other relief as this Court may deem just and proper.

Dated: May 15, 2017

Respectfully submitted,

_____
JASON P. REINSCH
Texas Bar No. 24040120
JESSICA B. MAGEE
Texas Bar No. 24037757

United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Ph: 817-900-2601 (jpr)
Fax: 917-978-4927
*reinschj@sec.gov*
*mageej@sec.gov*

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION