## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| THURMAN P. BRYANT, III and BRYANT UNITED CAPITAL FUNDING, INC. | § § § | Case 04:17-CV-00336-ALM |
| Defendants, | § § | |
| And | § § | |
| ARTHUR F. WAMMEL, WAMMEL GROUP, LLC, THURMAN P. BRYANT, JR., CARLOS GOODSPEED a/k/a SEAN PHILLIPS d/b/a TOP AGENT ENTERTAINMENT d/b/a/ MR. TOP AGENT ENTERTAINMENT | § § § § § § § | |
| Relief Defendants. | § | |

## RECEIVER'S *EX PARTE* EMERGENCY MOTION TO EXPAND THE RECEIVERSHIP AND ASSET FREEZE AGAINST THE WAMMEL DEFENDANTS, FOR TEMPORARY RESTRAINING ORDER, AND FOR PRELIMINARY INJUNCTION

Jennifer Ecklund, the Court-appointed Receiver (the "**Receiver**") for Thurman P. Bryant, III and Bryant United Capital Funding, Inc. (collectively, the "**Defendants**") receivership estates (together, the "**Receivership Estate**" or the "**Receivership**") in the above-captioned case (the "**Case**"), by and through undersigned counsel, hereby files this *Ex Parte Emergency Motion to Expand the Receivership and Asset Freeze Against the Wammel Defendants, for Temporary Restraining Order, and for Preliminary Injunction and Brief in Support* (the "**Motion**").

# I.
## INTRODUCTION

Finding that there was good cause to believe that they had committed securities fraud, this Court imposed a receivership over Thurman P. Bryant, III and Bryant United Capital Funding, Inc. ("**BUCF**") (collectively, Bryant and BUCF, the "**Receivership Defendants**").  The Receivership Defendants, however, used and worked in concert with a number of other entities and parties to effectuate the fraud.  The Receivership Defendants and the Wammel Defendants (defined below) created interlocking Ponzi schemes that were symbiotic in nature—using the investors from one Ponzi scheme to pay off the other Ponzi scheme investors.  Although BUCF and the Wammel Group have different investors, due to the interdependent nature of the Ponzi schemes created by the Receivership Defendants and the Wammel Defendants, the Receiver cannot unwind one without also unwinding the other.  The level of interaction between the Receivership Defendants and the Wammel Defendants requires that the Wammel Defendants now be included.

The Receiver moves the Court to expand the Receivership so that the following are placed in receivership and made subject to the asset freeze:

- Relief Defendant Arthur F. Wammel ("**Wammel**");

- Wammel Group Holdings Partnership ("**WGHP**"); and

- Wammel Group, LLC (the "**Wammel Group**," together with Wammel and WGHP, the "**Wammel Defendants**").

As more fully set forth in this Motion, the Receiver's *Ex Parte* Emergency Motion should be granted because (1) the Wammel Defendants participated in the fraud with the Receivership

Defendants, and (2) the Wammel Defendants are affiliated with the Receivership Defendants.

Supporting evidence includes the following:

- **The Receivership Defendants and the Wammel Defendants were intertwined.** The Receivership Defendants and the Wammel Defendants created a virtual spider's web of interlocking entities that they utilized in connection with the investment scheme out of which this case arises.

- **The Wammel Defendants received significant transfers from the Receivership Defendants.** The Wammel Defendants received over $16.2 million from BUCF from 2011 to date.

- **The Wammel Defendants commingled BUCF investors funds with Wammel Group investor funds.** The Wammel Defendants used the majority of the $16.2 million of BUCF investor capital received, commingled with $28.6 million in funds raised from the Wammel Defendants' own investors, to fund speculative options and securities trading.

- **The Wammel Defendants dissipated assets.** The Wammel Defendants have dissipated over $7 million in investor monies since December 2016.

- **Like Bryant, Wammel personally benefitted.** Wammel benefitted personally by transferring or withdrawing over $5 million in investors funds received by the Wammel Group.

- **Wammel held various positions at BUCF and was aware of representations made to BUCF investors.** Wammel knew that Bryant communicated to BUCF investors that such monies would be used in the mortgage industry. Bryant communicated to Wammel the investment options he offered to BUCF investors. He further communicated to Wammel that BUCF investors were promised returns of 30%.

- **Wammel and Bryant falsified documents.** Wammel and Bryant coordinated the falsification of multiple documents. For example, acting as an employee of the Bryant entities, Wammel falsified documents for Bryant's personal benefit to purchase assets. Bryant also falsified documents for Wammel to solicit investor.

- **The Wammel Defendants violated the Receivership Order and TRO.** By dissipating BUCF assets, the Wammel Defendants violated (1) Judge Mazzant's *Order Appointing Receiver* ("**Receivership Order**") [Dkt. No. 17 at ¶ 16], and (2) Judge Mazzant's *Ex Parte Order Granting Motion for Temporary Restraining Order Preliminary Injunction, Asset Freeze, Appointment of Receiver, Document Preservation Order, Order to Make Accounting and Other Emergency Relief, and Setting Hearing Date on Plaintiff's Preliminary-Injunction Motion* (the "**TRO**") [Dkt.

No. 16 at ¶ 15].   The Receivership Order and TRO required an accounting and forbade the dissipation or removal of any BUCF assets.

- **Wammel pled the Fifth Amendment and has failed to preserve evidence.** In response to the SEC's discovery, Wammel pled the Fifth Amendment. Additionally, the Receiver was only recently made aware that the computer used by the Wammel Defendants to transact business is no longer available.

This requested relief is necessary to preserve, locate, and marshal the BUCF records and assets. Without it, the Receivership will be irreparably harmed by the continuing evaporation of assets. The requested relief furthers the public interest in that it will improve the percentage of recovery to investors and creditors of BUCF and in that it will bring to light the actions of the Wammel Defendants in their violations of the Receivership Order and TRO. The requested relief by the Receiver preserves the status quo and outweighs any harm accruing to the Wammel Defendants, which harm, if any, was occasioned by their own actions in participation in the scheme and disregarding the Receivership Order and TRO. Finally, the Receiver is likely to succeed on the merits of her causes of action for fraudulent transfer, conversion, civil conspiracy, and breach of fiduciary duty.

The Receiver's ultimate goal is to gather all of the available assets and to distribute those assets equitably among all of the investors and creditors. It simply makes sense to have all of the assets, including cash, property, and all of the claims related to the underlying fraud, in the same place. By formally including the Wammel Defendants in the receivership and asset freeze, the Court can ensure that it has the authority and the assets to make an equitable distribution.

# II.
# BACKGROUND

## A.    Course of Judicial Proceedings

1.      On May 15, 2017, Plaintiff, the Securities and Exchange Commission ("**SEC**"), filed its application for the appointment of a receiver for Defendants, Thurman P. Bryant, III and Bryant United Capital Funding, Inc. (the "**SEC Application**").

2.      Specifically, Bryant and BUCF promised investors their funds would be safely preserved in secure escrow accounts and used for the sole purpose of serving as proof of funds to enable BUCF to secure a line of credit with which to pursue a mortgage-related investment program resulting in 30% returns.   As Bryant, BUCF, and Wammel knew, these promises were false.   No secure escrow accounts existed, and there was no mortgage-related investment program.   Complaint, Dkt. No. 1 (the "**Complaint**"), at ¶ 3.   In reality, and directly contrary to representations they made, the Receivership Defendants commingled investor funds in a single deposit account controlled by Bryant, from which he, among other things, (a) funneled approximately $16.2 million to the Wammel Defendants; (b) misappropriated $4.8 million to fund his personal living expenses; (c) transferred $1.37 million to Relief Defendant Goodspeed; and (d) paid out at least $140,000 to Relief Defendant Bryant, Jr., all without investors' consent or knowledge.   *Id.*

3.      On May 15, 2017, after the Court's review of the SEC Application and upon the Court's conclusion that the Court has subject matter jurisdiction over this case and personal jurisdiction over the Defendants, the Court determined that entry of an order appointing a receiver over the Defendants was both necessary and appropriate to marshal, conserve, hold and operate all of the Defendants' assets pending further order of the Court.   Accordingly, the Court entered the Receivership Order on May 15, 2017, naming Jennifer Ecklund as the Receiver over the Receivership Estates.   The same day, the Court entered the TRO.

4.       The Receivership Order provided the following in paragraph 16:

All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, an[y] of the Receivership Defendants that receive actual notice of this Order by personal service, facsimile transmission or otherwise shall:   (A) Not liquidate, transfer, sell, convey, or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver; (B) Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without permission of this Court; (C) Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the SEC a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date or receipt of the notice; and, (D) Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

5.       Understanding that funds rightfully belonging to BUCF may surreptitiously be in the possession of third parties, the TRO provided the following in paragraph 15:

Defendants and their officers, agents, servants, employees, attorneys, *and all persons* in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are restrained and enjoined from, directly or indirectly, making any payment or expenditure of funds, incurring any additional liability (including, specifically, by advance on any line of credit and any charges on any credit card), or effecting any sale, gift, hypothecation or other disposition of any asset, pending provision of sufficient proof to the Court of sufficient funds or assets to satisfy all claims alleged in the SEC's Complaint . . . . (emphasis added)

6.       The SEC negotiated and the Court entered on [June 2, 2017] the *Agreed Order Granting Preliminary Injunction and Other Relief* [Dkt No. 27] (the "**Agreed Preliminary Injunction**") among Defendant Bryant, the Receiver, and the SEC.

7.       On June 8, 2017, the Wammel Relief Defendants filed an Answer to the Complaint [Dkt. No. 29].

8.      On June 9, 2017, Relief Defendant Thurman P. Bryant, Jr. filed an Answer to the Complaint [Dkt. No. 30].

9.      On July 10, 2017, Bryant filed an Answer to the Complaint [Dkt. No. 40]. Pursuant to the Receivership Order, the Receiver is charged with marshaling and preserving all the assets of the Defendants.

10.      After the TRO was granted, the SEC provided notice of the Receivership Order and TRO to the Wammel Defendants.

11.      On June 2, 2017, the Receiver provided notice of the Preliminary Injunction to the Wammel Defendants.  *See* June 16, 2017 E-mail from Receiver's Counsel K. Clark to the Wammel Defendants' Counsel T. Galloway (attaching Preliminary Injunction, attached hereto as **Exhibit A-30**.

12.      Since her appointment, the Receiver has conducted an initial review of the Receivership Defendants' and Wammel Defendants' businesses and has started her investigation into their business model.  *See*  Declaration of J. Ecklund at ¶ 4, attached hereto as **Exhibit A**.

13.      Likewise, the Receiver has taken steps to collect, marshal, and take control over the Receivership assets pursuant to this Court's directives.  *Id.*  The Receiver incorporates, as if fully set forth herein, her Initial Status Report, filed June 14, 2017 [Dkt. No. 32], which details the work the Receiver performed in accordance with the Receivership Order in the first thirty days following her appointment.

**B.      The Wammel Defendants Participated in the Fraud with the Receivership Defendants**

14.      Bryant and Wammel have a long history of working together dating back to 2007—first through Bryant's mortgage company, then creating separate investment schemes that

depended on and related to one another.   Exhibit A, Declaration of J. Ecklund ("**Ecklund Declaration**") at ¶ 7.

15.     Since at least March 2011, BUCF and Bryant, BUCF's CEO and President, have raised approximately $22.7 million from approximately 100 investors in Texas and other states, through materially false and misleading statements and omissions.  Complaint at ¶ 2.

16.     Since at least 2011, Wammel Group and Wammel, Wammel Group's owner, have raised approximately $28.6 million from approximately 16 investors.  Complaint at ¶ 48.   In addition, Bryant invested over $16.2 million in BUCF investor funds in Wammel Group.  Exhibit A, Ecklund Declaration at ¶ 9.

### i.     The Receivership Defendants and the Wammel Defendants were intertwined.

17.     The Receivership Defendants and the Wammel Defendants created a web of interlocking entities that they utilized in connection with the investment scheme out of which this case arises.  Exhibit A, Ecklund Declaration at ¶ 5.

18.     One entity—BUCF—offered and sold securities to investors.  Complaint at ¶ 2.  Other entities—Bryant United Holdings, Inc. dba Bryant United, dba Bryant Financial, dba Bryant United Realtors ("**BUH**"),[1] WGHP, and the Wammel Group—acted as conduits through which investor money flowed.  Each of these entities was owned or controlled by Bryant and/or Wammel who worked in concert to defraud investors.  Exhibit A, Ecklund Declaration at ¶ 6.  Each should formally be part of the receivership.

19.     As reflected in the documents and bank records obtained and reviewed by the Receiver, her counsel, and her forensic accountants, (1) investors would transfer money to

---

[1] *See* BUH National Mortgage Licensing System Details (listing Bryant Financial and BUCF as "Other Trade Names" for BUH), attached hereto as **Exhibit A-28**; *see also* Bryant Financial Financial Statements dated March 31, 2012 ("Bryant United Holdings, Inc./dba Bryant Financial"), attached hereto as **Exhibit A-41**.

BUCF, (2) BUCF would transfer money to the Wammel Group, (3) the Wammel Group would commingle such monies with the Wammel Group investor funds, and (4) the Wammel Group would eventually transfer funds back to BUCF.  Exhibit A, Ecklund Declaration at ¶ 8; Exhibit B, Declaration of B. Kleinman ("**Kleinman Declaration**") at ¶ 6.

20.     The chart below is a simplified graphic of the entities involved in the scheme and how funds from investors flowed through the Receivership Defendants and Wammel Defendants:



21.     In transferring monies between the entities, the Wammel Group and BUCF would "counterbalance," which is necessary to understand in order to obtain an accurate picture of the full amount of transfers between BUCF and the Wammel Group.

22.     For example, in December 2016 the Wammel Group reported that it was transferring $697,405.00 back to BUCF in purported returns.  *See* December 1, 2016 E-mail from A. Wammel to T. Bryant, attached hereto as **Exhibit A-22**.  In the same communication, the Wammel Group reported the receipt from BUCF of an additional $50,000.00 in BUCF initial investments.  *See id.*

23.     Thus, the Wammel Group counterbalanced and then only reported a deposit of the difference between the $697,405.00 and $50,000.00, $647,405.00, from the Wammel Group to the BUCF account.  *See id.*  Failure to account for such counterbalancing could result in an understatement in the funds transferred from BUCF to the Wammel Group.  Such counterbalancing further evidences the failure of the entities to accurately account for transfers between the entities.

24.     According to records seized by the Receiver, Bryant and Wammel created a separate entity in furtherance of the fraud (linking Wammel to the Bryant and BUCF fraud). This entity—WGHP—was owned as follows:

| Name | Capital Contribution and % Ownership Interest |
|---|---|
| Bryant United Holdings, Inc. | $200,000.00 at 50% |
| Wammel Group, LLC | $0.00 at 50% |

*See* General Partnership Agreement of Wammel Group Holdings Partnership, attached hereto as **Exhibit A-11**;[2] *see also* Activity Statements related to the partnership created by the Receivership Defendants and Wammel Defendants from June 2010 through March 2014 corresponding with the above ownership interests and confirming the above venture (the

---

[2] Although no executed version of the WGHP agreement has been produced to-date, Wammel sent the WGHP to Bryant for his signature in 2010.  *See* August 18, 2010 E-mail from A. Wammel to T. Bryant attaching WGHP Partnership Agreement, attached hereto as **Exhibit A-29** (BUCFN00514304).

"**Activity Statements**"), attached hereto as **Exhibit A-12**.   The General Partnership Agreement reflects that the "Business of the Partnership" as:

> The purpose and character of the business of the Partnership shall be to invest in stocks, options, and various [derivative] contracts and to engage in any and all activities related or incidental to carrying out the foregoing, and to conduct and engage in any and all activities permitted by law in furtherance of the business of the Partnership.

*See id.*

25.        As reflected in the Activity Statements, titled "Activity Statement of Bryant United Holdings, Inc." (which actually detail and confirm the partnership between the Receivership Defendants and the Wammel Defendants), the following terms are used to show transfers purportedly between BUH and the Wammel Group (which are actually between BUCF and the Wammel Group):

- "Initial Investment[s],"

- "Gross Monthly Income,"

- "Withdrawals,"

- "Ownership," and

- "Account Activity."

*See* Activity Statements, attached hereto as **Exhibit A-12**.  Such Activity Statements were sent by Wammel to Bryant on a monthly basis.  *See* March 31, 2014 E-mail from A. Wammel to T. Bryant, attaching March 2014 Activity Statement, attached hereto as **Exhibit A-13**.

26.        Furthermore, monthly balances of the "Initial Investment[s]" and "Account Activity" from such Activity Statements tie to BUCF's bank records, further linking the Wammel Defendants to the underlying fraud and proving that BUH was, in fact, the alter ego of BUCF.  *See id*; *see* Veritas Comparison of Bryant United Holding, Inc. Activity Statements and

Transfers Between BUCF and the Wammel Group, attached hereto as **Exhibit B-1**; *see also* Exhibit B, Kleinman Declaration at ¶ 5.

27.     Although the Activity Statements are titled for BUH, they actually reflect the activities of WGHP and represent monies flowing from BUCF to the Wammel Group.  These Activity Statements and the Receiver's Forensic Accountants' analyses of the same support that BUH and WGHP were knowingly used by Bryant and Wammel as a conduit for BUCF investor funds to further the investment scheme.

28.     When Bryant began operating through BUCF, he notified Wammel.  *See* July 25, 2011 E-mail from T. Bryant to A. Wammel providing him with the new BUCF entity and bank information, attached hereto as **Exhibit A-18** (BUCFN00185156).

29.     Wammel used Bryant's investor agreement template to create his own agreement for Wammel Group investors.  *See* August 23, 2013 E-mail from T. Bryant to. A. Wammel (sending Wammel the BUCF investor contract), attached hereto as **Exhibit A-35** (BUCFN00334975).

30.     Bryant and Wammel worked closely together, using all of their entities interchangeably, and frequently failed to differentiate in or distinguish between who worked for what entity.  *See* Exhibit A, Ecklund Declaration at ¶ 7.  For example, Bryant created statements for Wammel Group and Wammel created documents and statements for BUH and BUCF.  *See* August 15, 2013 E-mail from T. Bryant to A. Wammel creating Wammel Group monthly statements, attached hereto as **Exhibit A-19** (BUCFN00815160-83); *see* February 14, 2013 E-mail from A. Wammel to T. Bryant (discussing creating pay stub), attached hereto as **Exhibit A-20** (BUCFN00294331); *see also*, February 14, 2013 E-mail from A. Wammel as CFO to Keller Williams Realty regarding T. Bryant, attached hereto as **Exhibit A-21** (BUCFN00294396).

31.     The nature of the structure and operations between the Receivership Defendants and the Wammel Defendants reflects that they were interdependent.

### ii.     The Wammel Defendants received significant transfers from the Receivership Defendants.

32.     From July 2011 through April 2017, BUCF transferred $16,229,944 from BUCF to the Wammel Group.[3]   *See* Veritas Summary of Investor Funds and Returns Transferred Between BUCF and the Wammel Group, attached hereto as **Exhibit B-2**; *see also* Exhibit B, Kleinman Declaration at ¶ 10.   The returns or earnings expected to be transferred back to BUCF from the Wammel Group for the benefit of investors based upon documentation and representations provided to BUCF investors would be an additional $11,825,997 (*i.e.* 30% return on investment).   When combined with the initial investment of $16.2 million the total amount of funds that should have been returned equals $28 million.   *See* Veritas Summary of Investor Funds and Returns Transferred Between BUCF and the Wammel Group, attached hereto as **Exhibit B-2**; *see also* Exhibit B, Kleinman Declaration at ¶ 10.   However, the Wammel Group transferred only $15,887,588 back to BUCF (of the $28 million expected) through April 2017, accounting for some purported earnings and principal but not fully accounting for the amount of principal transferred to the Wammel Group.   *See See* Veritas Summary of Investor Funds and Returns Transferred Between BUCF and the Wammel Group, attached hereto as **Exhibit B-2**; *see also* Exhibit B, Kleinman Declaration at ¶ 10.   **Thus, the Wammel Group should hold $12,168,353 in principal from BUCF investor funds.**   *See* Veritas Summary of Investor Funds and Returns Transferred Between BUCF and the Wammel Group, attached hereto as **Exhibit B-2**; *see also* Exhibit B, Kleinman Declaration at ¶ 10.

---

[3] This accounts for over 70% of the total funds obtained from BUCF investors.

### iii. The Wammel Defendants commingled BUCF investor funds with Wammel Group investor funds.

33.     Wammel commingled Wammel Group investors' funds with BUCF investors' funds. The Wammel Defendants used the majority of the $16.2 million of BUCF investor capital received, commingled with $28.6 million in funds raised from the Wammel Defendants' own investors, to fund speculative options and securities trading. Complaint at ¶ 48; *see* Exhibit A, Ecklund Declaration at ¶ 9. The Wammel Defendants received BUCF investor funds and commingled them with money raised from the Wammel Group's non-BUCF investors in order to facilitate the interrelated Ponzi schemes to: (a) make distributions to BUCF; (b) make distributions to the Wammel Group's investors; and (c) fund high-risk investment schemes, including speculative options trading by Wammel, since at least 2011. Complaint at ¶ 5; Exhibit B, Kleinman Declaration at ¶ 8. The Wammel Group does not have, and never has had, any legitimate claim to the funds it received from BUCF. *Id.*

### iv. The Wammel Defendants dissipated assets.

34.     According to records of the Wammel Group's investment accounts held at OptionsXpress, the Wammel Group had an ending cash balance of $9 million and account value of $7.1 million in December 31, 2016. *See* OptionsXPress Account Statement for the Wammel Group dated December 31, 2016, attached hereto as **Exhibit A-24**; *see also* Veritas Summary of Wammel OptionsXpress Account 0502-2959, attached hereto as **Exhibit B-3**.

35.     In January, February, and March 2017, the account value dropped to $4.7 million, $2.3 million, and $1.6 million respectively. *See* OptionsXPress Account Statement for the Wammel Group dated January 31, 2017, attached hereto as **Exhibit A-36**; *see* OptionsXPress Account Statement for the Wammel Group dated February 28, 2017, attached hereto as **Exhibit**

**A-37**; *see* OptionsXPress Account Statement for the Wammel Group dated March 31, 2017, attached hereto as **Exhibit A-38**.

36.      As of the end of April 2017, the Wammel Group investment account at OptionsXPress had been dissipated to $454,270 in total account value.  *See* OptionsXPress Account Statement for the Wammel Group dated April 30, 2017, attached hereto as  **Exhibit A-25**; *see also* Veritas Summary of Wammel OptionsXpress Account 0502-2959, attached hereto as **Exhibit B-3**.

37.      As of the end of May 2017, the Wammel Group investment account at OptionsXPress had been dissipated to $200,546.85 in total account value.  *See* OptionsXPress Account Statement for the Wammel Group dated May 31, 2017, attached hereto as  **Exhibit A-26**; *see also* Veritas Summary of Wammel OptionsXpress Account 0502-2959, attached hereto as **Exhibit B-3**.

38.      As of the end of June 2017, the account balance of the Wammel Group investment account at OptionsXPress had $213,570.89 in value.  *See* OptionsXPress Account Statement for the Wammel Group dated June 30, 2017, attached hereto as  **Exhibit A-27**; *see also* Veritas Summary of Wammel OptionsXpress Account 0502-2959, attached hereto as **Exhibit B-3**.

39.      Thus, the Wammel Group has dissipated assets from December 2016 to June 2017 of over $7 million.  *See* Exhibit B, Kleinman Declaration at ¶ 11.  Due to such rapid dissipation of assets, the Receiver must take immediate action.

### v.      **Wammel and Bryant Personally Benefitted**

40.      Bryant misappropriated $4.8 million of BUCF investor funds to fund his personal living expenses.  Complaint at ¶ 3.

41.      Wammel withdrew or transferred to himself over $5.5 million of commingled BUCF investor funds and Wammel Group investor funds from 2011 to 2017.  *See* Veritas Summary of Withdrawals from Wammel Group, LLC, attached hereto as **Exhibit B-4**; *see also* Exhibit B, Kleinman Declaration at ¶ 12.

42.      Although Wammel more adequately adhered to the entity structure of the Wammel Group than Bryant with BUCF, he used it as a flow through to pay for his personal expenses.  In one instance, Wammel purchased an asset (his wife's home at 4607 Hispania View Drive, League City, Texas 77673 (the "**Wammel Home**")), using Wammel Group account funds (with commingled BUCF investor funds and Wammel Group investor funds) but vesting title to himself, individually.  *See* Property Detail Report for the Wammel Home, attached hereto as **Exhibit A-39**; see also Wells Fargo August 31, 2016 Bank Statement of Wammel Group (reflecting purchase of home for $339,357.94), attached hereto as **Exhibit A-40**.  In addition, Wammel used his personal address as his business address.  See August 15, 2013 E-mail from T. Bryant to A. Wammel creating Wammel Group monthly statements, attached hereto as **Exhibit A-19** (BUCFN00815160-83).  Together, these facts show that Wammel failed to maintain his business separate from his personal assets.

43.      Like Bryant, Wammel's personal gain from the receipt of proceeds from the BUCF investor scheme shows his participation in the fraud and reflects the necessity of his inclusion in the Receivership Estate.

## C. Further Evidence Demonstrates the Improprieties Involved and the Needs to Expand the Receivership

### i. Wammel worked for Bryant.

44.     In addition, Wammel worked for and with Bryant.  Wammel held varying positions at Bryant Financial.  Wammel was the Chief Operating Officer of Bryant Financial or BUH as early as February 2008.  *See* February 20, 2008 E-mail from A. Wammel to T. Bryant clarifying position as COO of Bryant Financial and attaching business card, attached hereto as **Exhibit A-1** (BUCFN00033629-30, BUCFN00033839); *see* February 21, 2008 E-mail from T. Bryant to A. Wammel confirming position as COO, attached hereto as **Exhibit A-2** (BUCFN00033639).  Wammel was the Chief Investment Officer of Bryant Financial or BUH in 2011.  *See* November 10, 2011 E-mail from A. Wammel with signature block of Chief Investment Officer, attached hereto as **Exhibit A-3** (BUCFN002058659).  Wammel also held himself out as the Chief Financial Officer of BUH and BUCF.  *See* Employment Verification to North Star Property Management confirming T. Bryant's salary with A. Wammel's signature as CFO of BUH and BUCF, attached hereto as **Exhibit A-4** (BUCFN00294256).[4]

### ii. Wammel had knowledge of Bryant's representations to BUCF investors.

45.     Among other things, BUCF and Bryant promised investors guaranteed minimum annual returns of 30% on risk-free investments Bryant represented he would make in the mortgage industry.  Complaint at ¶ 2.  Wammel knew that Bryant communicated that such investments would be in the mortgage industry.  *See, e.g.*, July 15, 2011 E-mail from T. Bryant to investor copying A. Wammel discussing mortgage investment, attached hereto as **Exhibit A-5**

---

[4] Wammel also e-mailed property companies as CFO on Bryant's, BUH's, and BUCF's behalf in 2013 sending paystubs and asset statements that Bryant asked Wammel to "make it look legit."  *See* February 14, 2013 E-mail from A. Wammel to T. Bryant (discussing creating pay stub), attached hereto as **Exhibit A-20** (BUCFN00294331); *see also*, February 14, 2013 E-mail from A. Wammel as CFO to Keller Williams Realty regarding T. Bryant, attached hereto as **Exhibit A-21** (BUCFN00294396).

(BUCFN00182720); *see also*, October 26, 2011 E-mail from T. Bryant to A. Wammel ("Please let me know if anyone in cabo if they might be interest in our mortgage wholesale escrow account…The CEO of Bryant united capital funding will be more than happy to talk with them….:) I will cater a program that fits their needs….:)"), attached hereto as **Exhibit A-3** (BUCFN00200859).

46.     Bryant communicated the investment options he offered to investors to Wammel. He further communicated that investors were promised returns of 30%. *See* September 7, 2010 E-mail from T. Bryant to A. Wammel re investment options to pose to investors, attached hereto as **Exhibit A-7** (BUCFN00114917).

47.     Wammel provided input as to how to structure investments and payouts to investors. *See* February 15, 2011 E-mail from A. Wammel to T. Bryant regarding the structure and payouts of investments, attached hereto as **Exhibit A-31** (BUCFN00156644).

48.     Bryant knew that Wammel was not actually investing BUCF monies in the mortgage industry (as promised to investors) but was instead using the funds for option trading. *See* February 1, 2011 E-mail from A. Wammel to T. Bryant (attaching account statement of OptionsXpress account reflecting Bryant's knowledge of Wammel's involvement in options trading), attached hereto as **Exhibit A-8** (BUCFN00154196-99).

49.     Although Bryant was at the forefront of communications with BUCF investors, Bryant communicated account statements, investment contracts, and detailed information regarding investors to Wammel, further reflecting Wammel's knowledge in the underlying representations made to investors. *See, e.g.* February 1, 2011 E-mail from T. Bryant to A. Wammel regarding specific investors, attached hereto as **Exhibit A-9** (BUCFN00154168); *see*

*also*, June 24, 2011 E-mail from T. Bryant to A. Wammel regarding investment contract terms for his review, attached hereto as **Exhibit A-10** (BUCFN00178464).

### iii.    Wammel falsified documents.

50.    In further support of the impropriety that existed between Bryant and Wammel, one need look no further than the deliberate falsification of documents for the express purpose of misleading others.

51.    Specifically, together Wammel and Bryant falsified documents—

- for the Wammel Group, *see* August 15, 2013 E-mail from T. Bryant to A. Wammel creating Wammel Group monthly statements, attached hereto as **Exhibit A-19** (BUCFN00815160-83);

- for Bryant's ability to purchase assets, *see* February 14, 2013 E-mail from A. Wammel to T. Bryant (discussing creating pay stub), attached hereto as **Exhibit A-20** (BUCFN00294331); *see also*, February 14, 2013 E-mail from A. Wammel as CFO to Keller Williams Realty regarding T. Bryant, attached hereto as **Exhibit A-21** (BUCFN00294396); *see also*, March 23, 2015 E-mail from T. Bryant to A. Wammel (requesting fake paystubs), attached hereto as **Exhibit A-33** (BUCFN00892654); and

- for BUCF's earnings, *see* July 23, 2013 E-mail from T. Bryant to A. Wammel (attaching doctored earnings statement for BUCF), attached hereto as **Exhibit A-34** (BUCF00331911).

### iv.    Wammel invested commingled funds in high risk options.

52.    Notwithstanding the facts that the Wammel Defendants should never have received the funds in the first place, the Wammel Group's options trading receipts from 2011

through 2016 totaled only about $5.9 million—well short of the sum required to pay BUCF investors the 30% returns they were promised.  Complaint at ¶ 6.  Trading records from 2017 reflect even more severe losses.  To date, BUCF has transferred $16.2 million in BUCF investor monies to the Wammel Group, and the Wammel Group has returned $15.8 million to BUCF in fictitious earnings.  Exhibit B, Kleinman Declaration at ¶ 9.  This $15.8 million is comprised of funds received from BUCF, funds raised from the Wammel Group's non-BUCF investors, its limited trading profits, and other sources—all of which the Wammel Group commingled.  *Id.*

53.     Notably, the Wammel Group ceased tendering monthly distributions to BUCF on or about April 1, 2017, soon after the SEC subpoenaed Wammel and the Wammel Group for documents related to the relationship with Bryant and BUCF.  Complaint at ¶ 23.   In April 2017, Wammel withdrew at least $290,000 from Wammel Group options trading accounts he controls and which contain, or contained, ill-gotten gains obtained from BUCF and, indirectly, BUCF investors.  *Id.*

54.     Despite the misuse of BUCF investor funds in options trading, the Wammel Defendants' performance in the options market varied wildly, and from 2011 to 2016 it received only $5.9 million from trading and suffered severe losses in 2017.  Complaint at ¶ 49.  Apart from options and securities trading, Wammel Group made approximately $300,000 from other investments using BUCF investor monies, including investments in two car dealerships, a boat and RV storage facility, and two luxury rental cars—all without BUCF investors' consent.  *Id.* Like Wammel Group's options trading, these other investments deviate from BUCF's purported short-term mortgage lending business.  *Id.*

55.     The Wammel Group's revenues from trading and other activities were not sufficient to generate BUCF's promised 30% investor returns.  Complaint at ¶ 50.  While the

Wammel Group paid $15.8 million to BUCF between 2011 and 2017 as *purported returns on investments* (or earnings), in reality those funds were comprised of (1) the $5.9 million in receipts from the Wammel Group's options and securities trading; and (2) ill-gotten investor funds obtained from BUCF; and (3) funds raised from the Wammel Group's own, non-BUCF investors.

       **v.**    **Wammel pled the Fifth Amendment in response to the SEC's discovery.**

56.      On May 18, 2017, the SEC served its First Set of Interrogatories to the Wammel Defendants.  Plaintiff's First Set of Interrogatories to Relief Defendants Arthur F. Wammel and Wammel Group, LLC, attached hereto as **Exhibit A-14**; Plaintiff's First Document Request to Relief Defendants Arthur F. Wammel and Wammel Group, LLC, attached hereto as **Exhibit A-15**.

57.      On May 22, 2017, the Wammel Defendants responded with a limited document production and by "invok[ing] the Fifth Amendment privilege against self-incrimination and declin[ing] to answer" the all four interrogatories—such interrogatories requested information regarding Wammel Group investor information, transfers between BUCF and the Wammel Group, and representations between the Receivership Defendants and the Wammel Defendants. Relief Defendants Arthur F. Wammel and Wammel Group, LLC's Response to Plaintiff's First Set of Interrogatories, attached hereto as **Exhibit A-16**; Relief Defendants Arthur F. Wammel and Wammel Group, LLC's Response to Plaintiff's First Document Request, attached hereto as **Exhibit A-17**.

58.      The investors are prejudiced by Wammels' decision to invoke the Fifth Amendment because Wammel has failed to preserve evidence and Wammel is the only person

who possesses information regarding the status and involvement of these entities, thereby preventing the Receiver from discovering such relevant information.

   **vi.    Wammel refuses to comply with the Receivership Order and has failed to preserve evidence.**

59.    Despite having received the Receivership Order, the Wammel Defendants have not provided any accounting to the Receiver of the funds that the Wammel Defendants received from entities covered by the Receivership in violation of paragraph 16 of the Receivership Order and paragraph 15 of the TRO.

60.    Moreover, during the Federal Rule of Civil Procedure Rule 26(f) Conference, the Wammel Defendants' counsel represented that computers used by the Wammel Group during the relevant time frame had either been disposed of or were no longer able to be located.  This was the first notification of any such destruction or disposal of relevant evidence and further confirms the needs for this emergency request to ensure all evidence is preserved.

### III.
### ARGUMENT

**A.    The Receiver moves for *ex parte* emergency relief under Federal Rule of Civil Procedure 65(b).**

This Motion should be granted *ex parte* in order to avoid further erosion of assets rightfully belonging to the Receiver and BUCF and to preserve potentially relevant evidence. Rule 65(b) of the Federal Rules of Civil Procedure provides that the Court may grant an *ex parte* temporary restraining order upon a showing of "irreparable injury" and "reasons supporting the claim that notice should not be required."  The Receivership Order provided in paragraph 16 that "all . . . persons  or  entities  which  have  possession . . . of  any  asset  or  funds . . . of  the Receivership Defendants . . . shall [] not liquidate, transfer, sell, convey, or otherwise transfer

[such assets or funds]."  The Wammel Defendants dissipation of over $8 million cash and $7 million in total value of the assets of the Receivership Defendants' funds directly violates the Receivership Order.

As detailed above, there is ample evidence of irreparable injury that has and will continue to accrue to BUCF absent a temporary restraining order prohibiting the Wammel Defendants' further dissipation of assets and authorizing the Receiver to conduct an unimpeded accounting examination to reclaim more BUCF assets.  This temporary restraining order must be obtained *ex parte* given the Wammel Defendants' recent dissipation of assets and total disregard for Judge Mazzant's Receivership Order and TRO.  Further, the Receiver respectfully requests that the Court consider this request on an emergency basis.  The Receiver therefore requests pursuant to Local Rule CV-7(l) that the Court hold an immediate *ex parte* hearing on this Motion.

Any notice to the Wammel Defendants would likely trigger the hastened dissipation and transfer of assets.  Wright & Miller explain that the *ex parte* TRO is ideal for situations like this one and may cause the further disposal or destruction of evidence:

> The *ex parte* temporary restraining order is indispensable to the commencement of an action when it is the sole method of preserving a state of affairs in which the court can provide effective final relief.  Immediate action is vital when imminent destruction of the disputed property, its removal beyond the confines of the state, or its sale to an innocent third party is threatened.  In these situations, giving the defendant notice of the application for an injunction could result in an inability to provide any relief at all.

11A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2951 at 257 (1995).  Under Rule 65(b), courts typically require a showing of irreparable injury, consideration of public interest, a relative weighing of the harm with and without the injunctive relief, and a showing of likelihood of success on the merits.  *Garcia v. United States*, 680 F.2d 29, 31 (5th

Cir. 1982); *Dilworth v. Riner*, 343 F.2d 226, 229 (5th Cir. 1965) (temporary restraining order is generally issued *ex parte*).

**B.      The Receiver moves to expand the receivership over the Wammel Defendants.**

The SEC brought this suit under the federal securities laws in order to enforce the law and to protect investors from further harm.  In so doing, the SEC acts "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws."  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  A significant objective of this case (and the Receiver's charge) is to ensure that all available assets are brought within the receivership so that they may be properly distributed to creditors, including investors. *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 234 (D. Nev. 1985), *aff'd* 805 F.2d 1039 (9th Cir. 1986).  This Court is thus, afforded great discretion in ordering the affairs of the estate.  *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 328 (5th Cir. 2001).

An aspect of this discretion is the ability to expand the existing receivership to include (1) parties who participated in the fraud with the Receivership Defendants, and (2) parties affiliated with the Receivership Defendants.  *See Elmas Trading Corp.*, 620 F. Supp. at 234-35; *also SEC v. Private Equity Mgmt. Group, Inc.*, No. CV 09-2901, 2009 WL 3074604, at *5 (C.D. Cal. 2009); *see SEC v. Nadel,* No. 8:09-cv-87-T-26TBM, 2013 WL 2291871, at *2 (M.D. Fla. May 24, 2013); *see also*, *SEC v. Torchia*, No. 1:15-cv-3904-WSD, 2016 WL 6212002, at *1-2 (N.D. Ga. Oct. 25, 2016).

> *1.      The Court should expand the Receivership to include parties who participated in the fraud with the Receivership Defendants.*

The Receiver's investigation has uncovered that the Wammel Defendants were substantial facilitators of the Receivership Defendants' activities and assisted in and participated

with the Receivership Defendants in defrauding investors.  Indeed, the Receiver's investigation has uncovered a consistent, systematic plan to defraud investors utilizing the Wammel Defendants and various BUCF entities.

The blueprint for the Wammel Defendants' level of participation in the fraud is starkly defined by the flow of investor funds to the Wammel Defendants:  the Wammel Group received over 70% of misappropriated funds, and Wammel, individually, received over $5 million of such commingled funds.  The result was that approximately 70% of BUCF investor monies for the period July 2011 through April 2017 were funneled to the Wammel Defendants.  The Wammel Defendants profited from the monies transferred to them from the BUCF investment scheme. Moreover, Wammel had knowledge of the underlying representations made by Bryant to BUCF investors and assisted Bryant in setting up the intricate web of interdependent entities. Accordingly, because the Wammel Defendants played an integral part in aiding the Receivership Defendants to defraud investors and participated in the fraud, the assets of the Wammel Defendants should be administered by the Receiver for the ultimate benefit of the defrauded investors.

Expansion of the receivership estate is proper although the non-receivership entity is not an alter ego of the receivership entities, where the non-receivership entity used scheme proceeds to generate profit.  *See SEC v. Nadel,* No. 8:09-cv-87-T-26TBM, 2013 WL 2291871, at *2 (M.D. Fla. May 24, 2013) (finding the third party's receipt of scheme proceeds to generate profit constituted participation in the fraud warranting expansion over the third party); *see also*, *SEC v. Torchia*, No. 1:15-cv-3904-WSD, 2016 WL 6212002, at *1-2 (N.D. Ga. Oct. 25, 2016).  Here, Wammel used proceeds from the BUCF scheme to generate profit for Wammel Group and himself.  As evidenced by the Wammel Defendants' rapid dissipation of assets, the value

remaining within the Wammel Defendants will be lost to all investors if the assets are not preserved and maintained going forward.

Further, that the Wammel Defendants have asserted the Fifth Amendment in response to discovery by the SEC seeking information regarding the status of their assets and involvement in the BUCF scheme further supports inclusion of the Wammel Defendants in the receivership. *See Elmas Trading Corp.*, 620 F. Supp. at 235 ("The Receiver is correct when he notes that [the two men who asserted the Fifth Amendment] may be the only ones who possess the information of the status of these various entities. Thus, this assertion is a pivotal issue in trying to determine whether to include the Receiver's proposed entities in the Receivership.").

The granting of equitable relief against the Wammel Defendants is appropriate, even without charging them with any wrongdoing, because they "possess illegally obtained profits but have no legitimate claim to them." *SEC v. Cherif*, 933 F.2d 403, 414, n.11 (7th Cir. 1991), *cert. denied*, 112 S. Ct. 966 (1992). The appointment of a receiver is a well-established equitable remedy available in SEC enforcement proceedings for injunctive relief. *See, e.g., SEC v. First Fin'l Group of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981). Accordingly, the Receiver requests that the Receivership Order be expanded to include the Wammel Defendants.

2.    *The Court should expand the receivership to include entities affiliated with the Receivership Defendants.*

In *Elmas Trading Corp.*, the Court concluded that because the operations between the receivership and other entities were so intertwined, in exercise of discretion an expansion of the receivership was proper. *Elmas Trading Corp.*, 620 F. Supp. at 233, 235, 241 n.3; *see also, SEC v. Creative Capital Consortium, LLC*, No. 08-81565, 2009 WL 10664430, at *1 (S.D. Fla. Sept. 21, 2009) ("Given the government's interest in preventing violations of federal securities laws,

under which this action arises, it is appropriate for the court to apply a 'more flexible approach in determining whether the corporate entities should be disregarded.'" (citing *Elmas Trading Corp.*).   Factors that should be considered in determining whether to expand the receivership over affiliated entities include:

(1)   The presence of common control or ownership among the defendants and the entities to be included in the receivership,

(2)   The transfer of money or assets between and among the entities in question,

(3)   Common addresses and office locations,

(4)   The records and ledgers of the entities are incomplete and do not conform to standard business practices.

*Elmas Trading Corp.*, 620 F. Supp. at 234-36.   The entities that the Receiver seeks to add to the receivership fulfill each of these factors.   Wammel, WGHP, and the Wammel Group should be included within the Receivership based on their common control, commingling of assets, and common location.

*First*, the evidence in this case supports the notion that the Receivership Defendants and the Wammel Defendants were commonly owned and controlled.   For example, WGHP, an entity purportedly owned by BUH and the Wammel Group—thus Bryant and Wammel—is commonly owned and controlled by the Receivership Defendants and the Wammel Defendants.   This entity, its owners, and assets worked in concert in a common enterprise to conduct fraudulent activities.   Moreover, Wammel's individual involvement and positions held with the Bryant's entities further demonstrates common control.   As previously indicated, Wammel was the COO, CIO, and/or CFO of Bryant Financial or BUH and BUCF.

*Second*, the transfer of money between the entities is undeniable.  The Receivership Defendants and Wammel diverted approximately $16.2 million from BUCF, through BUH and WGHP, to the Wammel Group.  Thereafter, this money was commingled with separate Wammel Group investor funds.  The Receivership Defendants and Wammel hid the payment of fees (for their personal benefit) and the source of the funds for those payments in a series of convoluted transactions.

*Third*, although the Wammel Defendants did not share a common office space or addresses with BUH or BUCF, the fact that Wammel served as the COO, CIO, and/or CFO of Bryant Financial or BUH and BUCF and WGHP was commonly owned by BUH and Wammel Group equitably outweighs the lack of a common physical address when considering the third factor.

*Finally,* the evidence confirms that Bryant and Wammel deviated from standard business practices by counterbalancing and falsifying documents.  The counterbalancing between the Wammel Group and BUCF reflects the failure of the entities to adequately keep records and ledgers reflecting accurate balances transferred between the parties.

Sufficient evidence exists under each of the factors to add the Wammel Defendants to this receivership.  Adding the Wammel Defendants benefits all of the investors.  The Wammel Group Investors have claims against the Receivership Estate's assets, and the Receivership Estate's creditors and investors have claims to the Wammel Group's and Wammel's assets.  The Court can best balance these competing claims if all of the creditors and all of the assets are in a single proceeding.  The Court should, therefore, expand the Receivership to include the Wammel Defendants.  *Elmas Trading Corp.*, 620 F. Supp. at 234-36.

C.     **The Receiver moves to extend the freeze order to the Wammel Defendants.**

In the course of her investigation, the Receiver has discovered information concerning several entities which were formed, owned, and controlled by Relief Defendants, specifically the Wammel Defendants, and which received substantial sums of money in the form of transfers from BUCF accounts.  The Receiver's investigation reveals that the Wammel Defendants control assets which rightfully belong to the defrauded investors of BUCF.   The circumstances surrounding the transfer of funds to the Wammel Defendants leads the Receiver to move the Court to extend the asset freeze to include these Relief Defendants.

An asset freeze is necessary against the Wammel Defendants in order to preserve the investor funds, especially given the Wammel Defendants' recent dissipation of assets.  An asset freeze "facilitate[s] enforcement of any disgorgement remedy that might be ordered" and may be granted "even in circumstances where the elements required to support a traditional Commission injunction has not been established."  *SEC v. Unifund SAL,* 910 F.2d 1028, 1041 (2d Cir 1990).

Courts recognize that an asset freeze is sometimes necessary to ensure that a future disgorgement order will not be rendered meaningless, and the Receiver may request asset freezes against relief defendants who have not yet been accused of violating any federal securities laws. *Janvey v. Adams*, 588 F.3d 831, 835 n.2 (5th Cir. 2009) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)); *SEC v. Connectajet.com*, No. 3:09-CV-1742-B, 2011 WL 5509896, at *5-6 (N.D. Tex. Nov. 9, 2011); *Warfield v. Arpe*, No. 3:05-cv-1457-R, 2007 WL 549467, at *6 (N.D. Tex. Feb. 22, 2007); *SEC v. Miller*, 808 F.3d 623, 635 (2d Cir. 2015).  The Receiver can request an asset freeze against the Wammel Defendants if the Receiver establishes that the funds to be frozen are the ill-gotten product of Bryant's wrongdoing, and that the Wammel Defendants do not have a legitimate claim to those funds.  *Janvey v. Adams*, 588 F.3d 831, 835 n.2 (5th Cir.

2009) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)). From a review of the foregoing and the attached Exhibits, it is clear that the Wammel Defendants were receiving funds which were derived directly from investors in BUCF. These transfers appear to have no legitimate business purpose and appear to have been made in furtherance of the BUCF scam. Accordingly, the Freeze Order should be expanded.

**D.  The Receiver moves for a temporary restraining order against the Wammel Defendants due to their wanton violations of the Receivership Order and previous TRO.**

To obtain a temporary restraining order (like the showing required to obtain *ex parte* relief), the Court will require a showing by the Receiver of (1) irreparable injury, (2) consideration of public interest, (3) a relative weighing of the harm with and without the injunctive relief, and (4) a showing of likelihood of success on the merits.

Under the first factor, the Wammel Defendants' wanton violations of the Receivership Order and TRO in misappropriating BUCF assets readily demonstrates that a temporary restraining order in this case is necessary to prevent further irreparable injury to BUCF. The Wammel Defendants wrongfully converted BUCF funds, both before and after Judge Mazzant enjoined such actions. The Wammel Defendants dissipated over $7 million in investor monies since December 2016. What is presently known of the Wammel Defendants' behavior is more than enough to warrant entry of this temporary restraining order to track down BUCF assets before they evaporate. But equally important, this behavior also strongly suggests that the temporary restraining order should be entered so that the Receiver can take actions to prevent further dissipation of presently unknown assets.

Second, granting the Receiver's request for a temporary restraining order will serve the public interest by maximizing the assets available to the Receiver in executing the goals of her

appointment.   In other words, the requested temporary restraining order will serve the public interest by preventing further conversion of BUCF assets.

Third, it follows that the balance of harm weighs in the Receiver's favor.   While the Wammel Defendants will undoubtedly claim great harm will accrue through entry of this TRO, to so find would reward the Wammel Defendants' misdeeds.   The required balancing test weighs the equities, and the Wammel Defendants are found wanting.   On the other side of the scales of justice are the interests of BUCF investors and the Receiver, who has been appointed to marshal the assets of BUCF wherever they may be found.

Finally, the Receiver can show likelihood of success on the merits on those causes of action that the Receiver will seek to assert against the Wammel Defendants that are relevant to the requested temporary restraining order, namely, fraudulent transfer, conversion, conspiracy, and breach of fiduciary duty.   Specifically, on the claim for fraudulent transfer, the Receiver will prevail because the Wammel Defendants are in receipt of funds directly traceable to the BUCF investors (without good cause or having provided reasonably equivalent value).   Furthermore, the facts as set forth herein show an unjustified, willful interference on the part of the Wammel Defendants with BUCF's possession and use of its property.   The Wammel Defendants converted funds.   Similarly, the Wammel Defendants' acts additionally constitute civil conspiracy because they collaborated with one another and Bryant/BUCF in systematically carrying out their plans.   The Wammel Defendants also owed fiduciary duties to BUCF, and their acts constitute a breach of those duties.   The Wammel Defendants' mismanagement, appropriation, and waste of BUCF assets were blatant violations of these important duties.   Thus, success on the merits of BUCF's claims is likely.

The conclusion that the Wammel Defendants' actions present issues worthy of more deliberate action is self-evident.  As set forth above, the evidence currently known to the Receiver indicates that the Wammel Defendants likely have exclusive possession, custody, and control of a significant portion of BUCF assets.  Further, it is reasonable to conclude that these assets are in danger of being utterly wasted in the near term absent Court intervention.  Such a dissipation of BUCF assets would have devastating effect on the ability of the Receiver, as an officer of the Court, to achieve the Court's objectives as set forth in the Receivership Order.

## IV.
## CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that this Court issue an order that provides for the following relief:

(1)    That the Court amend and expand the Receivership Order to include the Wammel Defendants;

(2)    That the Court freeze the assets of the Wammel Defendants; and

(3)    That the Court temporarily and preliminarily enjoin the Wammel Defendants from further violated the Receivership Order and pursuant thereto.

Dated:  July 19, 2017.

Respectfully submitted,

By:     */s/ Timothy E. Hudson*                          

Timothy E. Hudson
State Bar No. 24046120
Tim.Hudson@tklaw.com

Katharine Battaia Clark
State Bar No. 24046712
Katie.Clark@tklaw.com

Mackenzie S. Wallace
State Bar No. 24079535
Mackenzie.Wallace@tklaw.com

THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
**PROPOSED COUNSEL TO RECEIVER**