# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § § § § § | |
| Plaintiff, | | |
| v. | | |
| THURMAN P BRYANT, III; BRYANT UNITED CAPITAL FUNDING, INC. | § § § § | Civil Action No. 4:17-CV-00336 Judge Mazzant |
| Defendants, | § § | |
| ARTHUR F. WAMMEL; WAMMEL GROUP, LLC; THURMAN P. BRYANT, JR.; CARLOS GOODSPEED a/k/a SEAN PHILLIPS d/b/a TOP AGENT ENTERTAINMENT d/b/a MR. TOP AGENT ENTERTAINMENT | § § § § § § § § | |
| Relief Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are the Receiver's Motion for Preliminary Injunction (Dkt. #44) and Arthur F. Wammel and Wammel Group, LLC's Motion for Reconsideration (Dkt. #56). After reviewing the relevant pleadings, motions, and evidence presented at the hearing, the Court finds the preliminary injunction should be granted and the motion for reconsideration should be denied.

## BACKGROUND

Thurman P. Bryant, III ("Bryant") is the President and CEO of Bryant United Capital Funding, Inc. ("Bryant Capital") (collectively, "Defendants"). Bryant Capital offered investors an investment opportunity in which Defendants promised that investors' money would be placed in a "secured escrow account" and would earn annual returns of 30% (or 2.5% per month). As

part of the investment scheme, Bryant Capital partnered with Wammel Group, LLC ("Wammel Group"), which in turn invested Bryant Capital funds in a number of investments. Wammel Group is wholly owned and operated by Arthur F. Wammel ("Wammel") (collectively, "Wammel Parties"). Each month, Wammel Group would distribute funds back to Bryant Capital as returns.[1] Bryant and Wammel agreed that they would share equally in any returns greater than the 30% annual rate. Bryant expected Wammel to return greater than 30% on a regular basis, otherwise Bryant would not make a profit.

From June 2011 through April 2017, Bryant Capital received approximately $22.7 million from approximately 100 investors. Of that money, Bryant Capital transferred more than $16.2 million to Wammel Group as principal for investments. At the hearing, Bryant testified that he did not know how Wammel was investing the funds, but he did understand that the funds would be in a "hedge" for the benefit of the group. Wammel Group held a Wells Fargo account in which it commingled funds obtained from Bryant Capital investors with funds obtained from Wammel Group investors. Wammel Group then placed these funds into at least two investment accounts: OptionsXpress and TD Ameritrade. Each month, Wammel Group withdrew funds from the investment accounts, placed them in the Wells Fargo account, and then transferred them to Bryant Capital.

Investments made by Wammel Group struggled to earn the required 2.5% monthly returns. Based on the agreement with Bryant Capital, Wammel Group should have earned $11.8 million in returns for Bryan Capital from 2011 to 2017. Wammel Group distributed to

---

[1] Numerous transfers between Defendants and Wammel Group actually appear as Bryant United Holdings, Inc. ("Bryant United"). After reviewing the numerous account and activity statements for Bryant United, Bryant Capital, and Wammel Group, the Receiver's retained forensic accountant, Brandi Kleinman, determined that Bryant United and Bryant Capital were essentially the same entity. Without deciding whether these entities are alter egos of each other, it is sufficient for the Court to look past any distinction. The current proceeding is not against Defendants or Bryant United and the Wammel Parties have not disputed any difference. Further, any distinction does not affect the Receivership Estate.

Bryant Capital $15.9 million purportedly as returns. Even if Wammel Group made the minimum return over that period, it should still hold $12.2 million in principal for Bryant Capital. However, on April 30, 2017, Wammel Group had total account values across all of its accounts of approximately $1 million. Since then, Wammel Group OptionsXpress account lost approximately $200,000 and was closed by OptionsXpress.

Despite clear deficiencies in returns, Wammel Group distributed approximately 3% monthly returns and significant profits for Wammel and Bryant. To do this, Wammel Group used funds from other sources. While Wammel Group did produce account statements with divisions of assets held in the account, the Receiver's forensic accountant, Brandi Kleinman, testified that Bryant Capital funds were in fact commingled with funds from Wammel Group investors.

Because Wammel Group was not earning enough to make its payouts, Wammel falsified documents that he sent to Bryant Capital (SEC Exhibit 3)[2] and to investors to appear as if Wammel Group's investments were successful. Wammel represented to one investor that Wammel Group accounts had $41 million more in assets than it did (*Compare* SEC Exhibits 10–13).

Despite operating at a loss, Wammel Group distributed large incomes to Wammel and to Bryant, individually. Combined, Wammel and Bryant profited by approximately $10 million. Wammel personally withdrew $5.5 million to fund personal expenses, including a house for $339,957.94 (R. Exhibits 21 & 22).

On May 15, 2017, the Securities and Exchange Commission ("SEC") filed a complaint against Bryant and Bryant Capital alleging securities fraud in connection with a series of interrelated Ponzi schemes operated by Bryant and the Wammel Parties (Dkt. #1). On May 15, 2017, the Court entered an order appointing a receiver over Bryant and Bryant Capital

---

[2] At the August 2, 2017 hearing, the Court admitted several exhibits into evidence for the purpose of this hearing.

("Receivership Order"). The Receivership Order gave the Receiver exclusive jurisdiction to marshal, conserve, hold, and operate all of Defendants' assets. The Receivership Order requires:

> All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody, or control of any assets or funds held by, in the name of, or for the benefit of, directly or indirectly, an[y] of the Receivership Defendants that receive actual notice of this Order . . . shall:
>
> A. Not liquidate, transfer, sell, convey, or otherwise transfer any assets securities, funds, or accounts in the name of or for the benefit of the Receivership Defendants except upon instructions from the Receiver.

(Dkt. #17 at ¶ 16). From December 2016 to June 2017, Wammel Group's OptionsXpress account declined in value by more than $7 million.

On July 19, 2017, the Receiver filed its Ex Parte Motion to Expand the Receivership and Asset Freeze Against the Wammel Defendants, for Temporary Restraining Order, and for Preliminary Injunction (Dkt. #44; Dkt. #45). On the same day, the Court granted Receiver's motion and entered an Amended Order Appointing Receiver, which added Wammel, Wammel Group, and Wammel Group Holdings Partnership[3] as Receivership Defendants (Dkt. #48). Also on July 19, 2017, the Court entered an emergency temporary restraining order restraining the Wammel Parties from interfering with the Receivership Order, and setting a hearing for the matter on August 2, 2017 (Dkt. #49) (the "TRO").

On July 25, 2017, the Wammel Parties filed an Emergency Motion and Brief for Reconsideration of Ex Parte TRO, Preliminary Injunction, Asset Freeze, and Receivership Orders (Dkt. #56). On August 1, 2017, the Receiver filed a response to the Wammel Parties'

---

[3] Wammel Parties point out in their response that Wammel Group Holdings Partnership ("Wammel Partnership") may not exist, and even if it does exist, it has not been sued or appeared in any pleading in this case. At the hearing, the Wammel Parties demonstrated that the partnership agreement was never signed. However, Bryant testified in terms of the Wammel Partnership as the agreement between Bryant Capital and Wammel Group, and Wammel asserted his Fifth Amendment right to whether he was a partner in the Wammel Partnership. The Court finds sufficient evidence to support the orders against Wammel Partnership.

motion (Dkt. #73). On August 1, 2017, the SEC filed a response to the Wammel Parties' motion (Dkt. #74).

On August 2, 2017, the Court held a hearing on the TRO and Wammel Parties' motion for reconsideration. Wammel was called to testify at the hearing, but exercised his Fifth Amendment rights to every substantive question that was asked.[4] After the hearing, the Court found good cause to extend the TRO an additional 14 days, so that the Court could write an opinion regarding the preliminary injunction (Dkt. #75). This memorandum opinion and order addresses the preliminary injunction and Wammel Parties' motion for reconsideration.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiff[] [has] clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

A district court has broad authority to enforce its orders and to protect assets in a receivership. *SEC v. Stanford Int'l Bank Ltd.*, 424 F. App'x 338, 340 (5th Cir. 2011) (citing

---
[4] Bryant was also called to testify. However, he asserted his Fifth Amendment rights to only a few questions.

*Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985)). "Such orders can serve as an important tool permitting a district court to prevent dissipation of property or assets . . . ." *Schauss*, 757 F.2d at 654 (citing *W. Gulf Mar. Assoc. v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985)). Finally, these orders may be effective against non-parties or parties joined only as relief defendants. *Janvey v. Adams*, 588 F.3d 831, 834 (5th Cir. 2009); *Schauss*, 757 F.2d at 654.[5]

### I. Likelihood of Success on the Merits

To prevail on its motion for preliminary injunction, the Receiver must demonstrate a substantial likelihood of success on the merits. This requires the Receiver to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey*, 647 F.3d at 595–96). A prima facie case does not mean the Receiver must prove it is entitled to summary judgment. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). The Receiver has demonstrated a substantial likelihood of success on all of its claims.

The Receiver seeks a preliminary injunction against the Wammel Parties, preventing the Wammel Parties from further violating the Receivership Order. The Receiver bases its motion on fraudulent transfer, conversion, conspiracy, and breach of fiduciary duty causes of action. To prevail on its application for preliminary injunction, the Receiver need only prevail on one of its theories. *Ferguson v. Ashcroft*, 248 F. Supp. 2d 547, 556 (M.D. La. 2003); *Oxford House, Inc. v. Township of Cherry Hill*, 799 F. Supp. 450, 463 (D.N.J. 1992).

First, the Receiver asserts fraudulent transfer as a basis for an injunction. The Receiver argues that the Wammel Parties are in receipt of funds that were given by Defendants with actual

---

[5] The Wammel Parties do not dispute that they are properly before the Court as relief defendants. Therefore, the Court need not analyze their proper joinder. Nevertheless, the Court finds that the Wammel Parties are proper relief defendants, which the Court can grant relief. *Adams*, 588 F.3d at 834 (holding that a party is properly joined as a relief defendant when the party is in receipt of ill-gotten gains for which it does not have a legitimate claim).

intent to hinder, delay, or defraud Defendants' investors, or that were given without the Wammel Parties providing reasonably equivalent value. The Wammel Parties do not respond to this argument. The Court finds that the Receiver has stated a sufficient likelihood of success to warrant an injunction.

The Court must first determine the Receiver's standing to assert a fraudulent transfer claim. The Receiver has standing to bring any claims of the receivership entities—Bryant and Bryant Capital—against third-party recipients of the entities' assets that have been fraudulently transferred by the principal of the Ponzi scheme. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 191 (5th Cir. 2013). Here, the Receiver seeks to void transfers that the Wammel Parties received from Bryant Capital that have diminished the value of the Receivership estate. The Receiver has standing to bring such a claim.

The Texas Uniform Fraudulent Transfer Act ("TUFTA") provides the substantive law relevant here. *Janvey*, 647 F.3d at 596. Under TUFTA, the Receiver is entitled to recover funds from the Wammel Parties if it shows that Defendants transferred funds to the Wammel Parties (a) with actual intent to hinder, delay, or defraud Defendants' investors, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation. Tex. Bus. & Comm. Code Ann. § 24.005(a). The Receiver has proved a likelihood of success under either theory. The Court will address each in turn.

The Receiver has proved actual intent to defraud. "In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey*, 647 F.3d at 598 (citing *SEC v. Res. Dev. Int'l LLC*, 487 F.3d 295, 301 (5th Cir. 2007)). A Ponzi scheme is "a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose

7

example attracts even larger investments." *Ponzi Scheme*, Black's Law Dictionary (10th ed. 2014); *Alguire*, 647 F.3d at 597. The Receiver alleges that Defendants and the Wammel Parties operated a series of interlocking Ponzi schemes, using the investors in one Ponzi scheme to pay off other Ponzi scheme investors. Defendants promised investors guaranteed high returns of 30% annually on their investments. To follow through on these promises, Defendants transferred funds to the Wammel Parties, who then commingled Defendants' funds with Wammel Group investors' funds and invested in high-risk options trading. Wammel Group trading receipts from 2011 through 2017 show returns of only $5.9 million—well short of the sum required to pay Bryant Capital investors the 30% returns that they were promised. Nevertheless, Wammel Group paid $15.8 million to Bryant Capital between 2011 and 2017 as purported returns on investments. The funds returned to Bryant Capital were comprised of (1) the $5.9 million in receipts from Wammel Group's options trading; (2) funds from Bryant Capital's investors; and (3) funds from Wammel Group's investors.

Wammel also failed to maintain proper accounting. Wammel commingled funds to make more money available to pay investors their promised returns. Further, Wammel produced fraudulent documents to conceal the fact that Wammel Group and Bryant Capital were losing money. The Court finds this is sufficient evidence to establish a Ponzi scheme. Thus, the Receiver has proved a prima facie case of intent to defraud under TUFTA. The Wammel Parties do not assert that they qualify for TUFTA's affirmative defense. Therefore, the Receiver has sufficiently proved a likelihood of success on the merits of its fraudulent transfer claim.

Under the reasonably equivalent value theory, the Receiver must show that Defendants (a) were engaged in a business or transaction for which the Defendants' remaining assets were unreasonably small in relation to the business or transaction, or (b) intended to incur, or

reasonably should have believed that Defendants would incur, debts beyond their ability to pay as they became due. Tex. Bus. & Comm. Code § 24.005(a). The Receiver has proved that the Wammel Parties received Defendants' funds with the knowledge that Defendants would incur debts beyond their ability to pay investors as the payments became due. As the evidence above shows, the Wammel Parties had no reason to believe that Defendants could produce 30% annual returns on investments. Therefore, the Wammel Parties obscured accounting records, commingled funds, and falsified documents to conceal Defendants' shortcomings. Therefore, the Receiver has shown a likelihood of success of prevailing on this theory as well.

The Receiver also asserts conversion, conspiracy, and breach of fiduciary duty as grounds for an injunction. For the same reasons as stated above, the Court finds that the Receiver has established a likelihood of success on these claims.

Conversion under Texas law is "[t]he unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 (5th Cir. 2009) (quoting *Waisath v. Lack's Stores, Inc.*, 474 F.2d 444, 447 (Tex. 1971)). Wammel converted funds when he took $5.5 million as profits, despite failing to earn the minimum returns. Wammel had a right to half of the returns that were greater than 30% annually. He did not obtain returns greater than 30%. Therefore, he had no right to the profits that he took.

To prove a cause of action for civil conspiracy under Texas law, a plaintiff must establish the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). The

Wammel Parties conspired to siphon assets from Bryant Capital contributions. The Wammel Parties were not permitted to take any profits from the Bryant Capital funds unless the returns were greater than 30% annually. As the evidence shows, the Wammel Parties were not successful in earning more than 30% annual returns. Therefore, they did not have the right to take any profits from Bryant Capital funds. Nevertheless, Wammel withdrew $5.5 million for personal expenses. Because of commingling and because Wammel asserted his Fifth Amendment rights to every question asked of him, the Court cannot determine how much of Wammel's profits were properly taken. The Court finds sufficient evidence to support a likelihood of success that Wammel conspired to convert funds attributable to Bryant Capital.

Finally, to establish a claim for breach of fiduciary duty, the Receiver must show: (1) a fiduciary relationship between Defendants and the Wammel Parties; (2) the Wammel Parties breached their fiduciary duties to Defendants; and (3) the Wammel Parties' breach caused injury to Defendants. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)). A fiduciary relationship "exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Tex. Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980). The Wammel Parties owed a fiduciary duty to Bryant Capital to invest funds in a reasonable manner and to distribute returns according to the investors' rights. The Wammel Parties breached this duty by retaining funds as profits despite not earning the agreed-to amount. As a result, Bryant Capital has lost millions of dollars. The Court finds a likelihood of success on this claim as well.

## II. Likelihood of Irreparable Harm

The Receiver must demonstrate it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600. A district court may issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of assets is limited to the property in dispute or its direct, traceable proceeds. *Id.* (citing *Productos Carnic, S.A. v. Cent. Am. Beer & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir. 1980)). An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

The Court finds that a preliminary injunction is necessary to prevent further irreparable injury to Defendants. The Receiver successfully showed that the threatened harm—dissipation of assets—would impair the Court's ability to grant an effective remedy. The Receiver ultimately seeks to protect the Receivership Estate. If the Wammel Parties dissipate or transfer assets out of the jurisdiction, the district court would not be able to grant an effective remedy. The Receiver has shown that the Wammel Parties have dissipated significant assets and have the opportunity to continue to do so.

Further, the Receiver has produced sufficient evidence to prove commingling of assets such that segregation between assets used in the Defendants' scheme and those of Wammel Parties' investors cannot be done. Therefore, a preliminary injunction over all of Wammel Parties' acts is appropriate to protect against dissipation of Defendants' assets.

### III. Balance of Hardships

When deciding whether to grant an injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted).

The hardships tip in favor of an injunction. On one side, the Defendants' investors are innocent parties who will likely get very little return. If an injunction does not issue, the Wammel Parties may further dissipate the Receivership assets, rendering essentially useless any judgment on the merits. On the other hand, the Wammel Parties have profited greatly by deceiving investors. Balancing the hardships favors an injunction.

### IV. The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312). This factor overlaps substantially with the balance-of-hardships requirement. *Id.*

The public interest favors the ability of people to invest without fear of being defrauded. The Court has entered a Receivership Order to protect the investors who were likely defrauded. The Wammel Parties have violated the Receivership Order by dissipating assets. The public interest also favors enforcing judicial orders. Therefore, an injunction preventing the Wammel Parties from further violating the Receivership Order is in the public interest.

### V. The Wammel Parties' Motion to Reconsider

The Wammel Parties argue that the TRO should be set aside because it violated the Wammel Parties' due process rights; because the Receiver misled the Court in its motion; and

12

because the U.S. Marshals and Receiver executed an unconstitutional search and seizure. The Wammel Parties' objections are without merit.

First, the Wammel Parties argue the TRO violated their due process rights because they had no notice or opportunity to be heard before the Receiver took their property. Further, the Wammel Parties argue that they did not have notice because they have not been named as defendants in any action by the SEC and thus do not know what they did wrong. The Receiver argues that the appointment of a receiver and concomitant taking of property do not violate the Fourth Amendment. The Court agrees with the Receiver.

The Wammel Parties' first argument is unfounded. The complaint filed by the SEC stated substantially similar material facts to this motion (*See* Dkt. #1). The Wammel Parties have been involved in the investigation since December 2016 and answered this suit as relief defendants on June 8, 2017 (Dkt. #29). Although the SEC did not name the Wammel Parties as regular defendants, the SEC did allege facts showing a relationship between Defendants and the Wammel Parties. The Wammel Parties cannot now claim, after answering this suit as relief defendants and being served with a summons and many orders, that they do not have notice of potential wrongdoing, especially when their acts indicate otherwise.

Further, the cases cited by the Wammel Parties are distinguishable. In *United States v. James Daniel Good Real Property*, the immovability of real property destroyed the alleged exigent circumstances that permitted a governmental taking before a hearing could take place. 510 U.S. 43, 62 (1993). In *James Daniel Good Real Property*, the government forfeited James Good's house and the four-acre parcel on which it was situated because it was involved in his drug crime. *Id.* at 47. In an ex parte proceeding, a magistrate judge found that the Government established probable cause to believe that Good's property was subject to forfeiture. *Id.* The

Government then seized the property without notice or a hearing. *Id.* In analyzing the *Mathews* factors, the Supreme Court held that the seizure of real property is not one of the extraordinary circumstances that justifies ex parte forfeiture because real property is not moveable and thus at minimal risk for destruction or dissipation. *Id.* at 62. The Supreme Court went on to state that "[t]o establish exigent circumstances, the Government must show that less restrictive measures—*i.e.*, . . . restraining order . . .—would not suffice to protect the Government's interest in preventing the sale, destruction, or continued unlawful use of the real property." *Id.*

Second, *United States v. $8,850 in U.S. Currency* dealt with a post-seizure delay. 461 U.S. 555, 562–63 (1983). The aggrieved party conceded that the Government could seize her property without a prior hearing. *Id.* at 562.

Finally, in *Fuentes v. Shevin*, the issue was the constitutionality of a seizure upon bare assertions that were not reviewed by a neutral decision-maker. 407 U.S. 67, 93 (1972). None of these cases bears on the seizure here.

Due Process requires "such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The Supreme Court in *Mathews v. Eldridge* enunciated several factors to consider before depriving a person of property without a hearing: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 340–48. Additionally, when the Government claims exigent circumstances necessitate immediate seizure, "the Government must show that less restrictive measures—*i.e.*, . . . restraining order . . .—would not suffice to protect the Government's interest in preventing the

14

sale, destruction, or continued unlawful use of the real property." *James Daniel Good Real Property*, 510 U.S. at 62.

Here, the private interest that will be affected—the Wammel Parties' business—was greatly outweighed by other factors. Thus, the TRO was appropriate. The risk of an erroneous deprivation was small because the TRO would last fourteen days at a maximum before a hearing. Further, the immediate seizure of the Wammel Parties' assets was essential to secure an important governmental interest, that of the Receiver. The Receiver articulated detailed reasons to believe that prompt action was necessary because the Wammel Parties were closely related to Defendants and the assets at issue were extremely moveable. To prove the liquidity and danger of dissipation, the Receiver provided evidence that several million dollars had disappeared in a short period of time leading up to the ex parte motion. The Receiver provided sufficient evidence that the Wammel Parties dissipated funds despite the Receivership Order. Thus, a less restrictive measure would not sufficiently protect the Government's interest. *James Daniel Good Real Property*, 510 U.S. at 62. Finally, the government exercised this power through its agent, the duly appointed Receiver, and after review by a neutral judge. None of the parties involved in obtaining the ex parte TRO were interested. *Cf. Fuentes*, 407 U.S. at 93. Finally, the Wammel Parties are already parties to this proceeding, even if only as relief defendants, and thus have had a full opportunity to litigate their rights. *SEC v. Cavanagh*, 155 F.3d 129, 136–37 (2d Cir. 1998). Thus, the need for immediate seizure outweighed the general desire for pre-deprivation hearing. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974) (holding ex parte seizure was appropriate where pre-deprivation notice and hearing could lead to the removal, destruction, or concealment of the subject property); *see also Mathews*, 424 U.S. at 340–48.

Further, the Wammel Parties' arguments that the Receiver misled the Court are not persuasive.

First, the Wammel Parties argue that the alleged dissipation occurred before the Receivership Order was entered and that assets disappeared because of bad luck in the investment market, not dissipation. Neither argument is persuasive. The purpose of a receivership is to marshal and protect assets so that they are available to pay disgorgement orders and civil penalties. *SEC v. Brooks*, No. Civ.A.3:99–CV–1326–D, 1999 WL 493052, at *2 (N.D. Tex. July 12, 1999). Therefore, all that matters is that the Wammel Parties possessed Receivership assets and put them at risk of loss. *See Dissipation*, Black's Law Dictionary (10th ed. 2014) ("The use of an asset for an illegal or inequitable purpose . . . ."). The Wammel Parties had significant access to Receivership assets and invested those assets in risky investment schemes, resulting in substantial losses. The Wammel Parties have not offered any evidence that their access has been restrained. Therefore, the Wammel Parties had significant, continued access to Receivership assets, and the Wammel Parties have dissipated those assets.

Next, the Wammel Parties argue that the present application was not an emergency because the SEC knew about the dissipation of assets beginning in December 2016, but has not added the Wammel Parties as defendants. This is unavailing. The SEC and Receiver are independent parties with different roles and procedures. *In re Sherman*, 491 F.3d 948, 963 (9th Cir. 2007). The Receiver provided substantial evidence of commingling of funds and significant withdrawals by Wammel and Bryant, despite not earning enough income to support such distributions. The Court finds this to be sufficient to warrant emergency relief to protect the Receivership Estate.

Next, the Wammel Parties contest the Receiver's characterization of the disappearance of Wammel's computer. The Court did not rely on this fact in coming to the foregoing conclusions. Therefore, this argument is moot.

Next, the Wammel Parties contest the Receiver's characterization that Wammel "refused" to comply with court orders. The Wammel Parties argue that they were not subject to the original TRO entered in May. They argue that the Receiver, despite serving them with the TRO and Receivership Order, did not notify the Wammel Parties that they were subject to either order. The Wammel Parties further argue that the Receiver made no effort to obtain voluntary compliance before filing this motion. This argument is not convincing.

It is undisputed that the Receiver gave actual notice of the TRO and Receivership Order to the Wammel Parties. The Wammel Parties answered the complaint as relief defendants. The Receiver was under no obligation to interpret the order and act as counsel for the Wammel Parties. The order speaks for itself, the Wammel Parties know their own actions, and a team of competent attorneys represents the Wammel Parties. After reviewing all of the evidence, the Wammel Parties had no legitimate reason to believe that the order did not apply to them. Nor did the Wammel Parties seek clarification on their hyper-technical reading. The Receiver has no obligation to seek voluntary compliance before filing a motion with the Court. The fact that the Receiver sought ex parte relief explains why the Receiver did not seek voluntary compliance. The Court independently reviewed the Receiver's reasons for emergency ex parte relief and found them sufficient. Thus, the Receiver's characterization of the Wammel Parties' "refusal" was not misleading, and in any event, harmless.

Finally, the Wammel Parties' invocation of the ethical rules is baseless. The Wammel Parties argue that the Receiver did not make full disclosures to the Court when it failed to inform

17

the Court of prior settlement discussions between the SEC and the Wammel Parties. The Wammel Parties further argue that the Receiver was not in full candor when it did not tell the Court that it never sought voluntary compliance and did not interpret the law for the Wammel Parties.

As the Court has previously discussed, these arguments are all meritless on their face. The SEC and Receiver are separate entities with different roles in the proceedings. The Wammel Parties' counsel even recognized and tried to use the difference between the SEC and Receiver as a sword during the hearing.[6] The fact that the Wammel Parties agreed with the SEC that there would be no asset freeze does not prevent the Receiver from seeking the same as it relates to protection of the Receivership Estate.

Further, the Receiver was not required to disclose the facts that the Wammel Parties now assert. The disciplinary rule requires the lawyer for the represented party "to make disclosures of unprivileged material facts known to the lawyer if the lawyer reasonably believes the tribunal will not reach a just decision unless informed of these facts." Tex. Disciplinary Rules Prof'l Conduct R. 3.03, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2005). The facts asserted by the Wammel Parties are not material because they do not affect the outcome. For similar reasons, the Receiver had no reason to believe that omission of those facts would lead to an unjust result. Therefore, the Wammel Parties' argument is unavailing.

The Court does not take lightly a party's invocation of the rules of disciplinary conduct. The Court understands the need for counsel to zealously advocate for his or her client. However,

---

[6] The Wammel Parties' counsel objected to the authenticity of a document containing a Wammel "Bates label" by (1) relying on Wammel's personal assertion of the Fifth Amendment; and (2) arguing that the document was not produced in discovery for this proceeding because there has been no discovery in a proceeding between the Receiver and Wammel Parties.  It was only after pointed questions by the Court that the Wammel Parties conceded that they did produce the document during the SEC's investigation beginning in December 2016.

this must be done with full introspection. The Texas Rules of Professional Conduct state: "A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials." Tex. Disciplinary Rules of Prof'l Conduct preamble ¶ 4. This should be contemplated before claiming ethical violations.

Finally, the Wammel Parties argue that the U.S. Marshals and Receiver conducted an invalid search and seizure because the TRO was obtained under knowingly or recklessly false statements. The Court disagrees. The Court has already explained that it finds no statement made by the Receiver to be false. The competent and credible evidence produced by the Receiver at the hearing nearly mirrored what was in the Receiver's brief. While this does not cure any taint of the TRO, it is evidence that the arguments and evidence in the briefing were valid. Thus, the Receiver did not make, and the Court did not rely upon, false statements. *United States v. Leon*, 468 U.S. 897, 922 (1984). Further, to the extent that the Receiver withheld information or gave misleading characterizations about the disappearance of Wammel's computer, material or otherwise, the Court did not rely on those allegedly misleading statements. Finally, the Wammel Parties do not identify any alleged fruits of the poisonous tree. The Receiver's evidence presented in the hearing was nearly identical to that presented in its brief. None of the documents or testimony necessarily came from the search and seizure of the Wammel Parties' property because the Receiver knew of the facts before any search or seizure of the Wammel Parties' property. Therefore, even if the TRO were tainted, it does not affect this order.

## CONCLUSION

It is therefore **ORDERED** that the Receiver's Motion for Preliminary Injunction (Dkt. #44) is hereby **GRANTED**.

It is further **ORDERED** that Arthur F. Wammel and Wammel Group, LLC's Motion for Reconsideration (Dkt. #56) is hereby **DENIED**.

It is further **ORDERED** that Arthur F. Wammel; Wammel Group, LLC; and Wammel Group Holding Partnership, their officers, agents, representatives, employees and successors, and all other persons in active concert and participation with them, are hereby enjoined from further violating the Receivership Order (Dkt. #17), and Amended Order Appointing Receiver (Dkt. #48), and any order pursuant thereto.

It is further **ORDERED** that unless terminated earlier, this preliminary injunction shall expire upon the issuance of a final decision by the Court in this case.

No bond shall be required.

**SIGNED this 15th day of August, 2017.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE